[No. 604.    October 19, 1895.]

CELSO BACA, APPELLEE, v. DEMETRIO PEREZ, AUDITOR OF PUBLIC ACCOUNTS, AND RUFUS J. PALEN, TREASURER OF TERRITORY OF NEW MEXICO; TRANQUILINO LABADIE, INTERVENER, APPELLANTS.

TERRITORIAL LEGISLATION—VALIDITY—CONSTRUCTION OF STATUTES.—It was not the intention of congress, by the act of June 19, 1878, making appropriation for the compensation of territorial officers and members and officers of territorial legislatures, and providing that "no greater number of officers or charge per diem shall be paid or allowed by the United States to any territory," to prohibit the territorial leg-

islatures from employing others subordinate to those named in the
act and providing for their payment out of the territorial treasuries,
or to restrict them in the exercise of their discretion as to their neces-
sities, but to limit the officers, to be paid out of the United States
treasury, to those enumerated in the act.   Braithwaite v. Cameron,
38 Pac. Rep. 1084.

ID.—ACQUIESCENCE BY CONGRESS—INFERENCE.—The territorial legislature
having assumed and exercised for a series of years the right to engage
additional subordinates, and congress having continuously acquiesced
in its exercise, the approval of that body may be reasonably infer-
red.   Cooley's Const. Lim. 34, note.

ID.—VALIDITY—CONSTRUCTION.—It is the duty of the courts to sustain
legislative action, unless clearly satisfied of its invalidity.

APPEAL, from a judgment for complainant, from
the First Judicial District Court, Santâ Fe County.
Reversed, and order entered dissolving injunction.

JOHN R. McFIE and EDWARD L. BARTLETT for ap-
pellants.

H. L. WARREN, A. B. FALL, and W. B. CHILDERS
for appellee.

SMITH, C. J.—The regular session of the thirty-
first legislative assembly of the territory of New Mexico
passed joint resolution number 5, and the same was
duly approved by the governor on the twenty-fourth
day of January, 1895.   This joint resolution provided
for the employment, and pay out of the territorial treas-
ury, of subordinate officers and employees in and about
the legislature, in addition to those provided for and
paid under and by act of congress approved June 19,
1878.   On January 25, 1895, the complainant, Celso
Baca, filed his bill of complaint with the clerk of the
district court of the First judicial district, at Santa Fe;
and alleged that he was the owner of taxable property,
and was a taxpayer resident, in the county of Guada-
lupe, in said territory of New Mexico, and that he
brought this suit for himself and in behalf of all other

taxpayers of the territory; and prayed for an order
restraining and enjoining the said defendant Demetrio
Perez, as territorial auditor of public accounts, from
auditing and issuing his warrants to any of said
subordinate officers and employees provided for in
joint resolution number 5, and to restrain and enjoin
Rufus J. Palen, as territorial treasurer, from paying,
out of any funds in his hands as such treasurer, any
warrants so issued in payment of services performed
by the subordinates, officers, and employees, as pro-
vided for in said joint resolution number 5; and further
alleged that the legislative assembly had no power or
authority to pass said joint resolution, for the reason
that the same is in contravention of the constitution
and laws of the United States. The court thereupon
made a rule upon the defendants to show cause, if any
they had, why an injunction should not issue as prayed
for. In response to the rule, the defendants, by their
legal adviser, the solicitor general of the territory, filed
their answer, admitting the truth of the material allega-
tions in the bill for the complainant, and the cause
was submitted on bill and answer. On January 29,
1895, the court granted an order for an injunction re-
straining and enjoining the defendants, the auditor of
public accounts and the territorial treasurer, as prayed
for in the bill of complaint. Thereupon Tranquilino
Labadie, as translator and one of the subordinate offi-
cers provided for in said joint resolution, appeared,
and asked leave to file an intervening petition, to be
made a party defendant in the suit, which leave was
granted. Said Labadie thereupon filed a demurrer to
the bill, and a motion to dissolve the injunction. The
demurrer sets out that said complainant has not legal
capacity to institute and sustain said suit; that the bill
of complaint does not contain or set forth any matter
of equity sufficient to authorize the injunction therein
prayed for; that the court had not jurisdiction to

grant or issue said writ of injunction upon the matter alleged in said bill; that the said court had not jurisdiction to grant or issue the said injunction against the said defendants, the said auditor and treasurer, without this defendant, and other persons directly and materially interested in the object of said suit, being parties thereto; and that the said bill of complaint is insufficient in law to authorize or maintain the said writ of injunction. We will proceed directly to determine whether the legislature, in the exercise of its legal power, was authorized to supplement the officers provided for it by

TERRITORIAL legislation: validity: construction of statutes.

congress with employees of their own creation, and to pay them for their services out of the territorial treasury. A recital of the legislation establishing New Mexico, and of certain provisions of congress common to all the territories, is essential to an intelligent comprehension of the controversy. Section 7 of the organic act, approved September 9, 1850, enacts that "the legislative power of the territory shall extend to all rightful subjects of legislation consistent with the constitution of the United States, and the provisions of this act." Section 1851 (approved September 9, 1850) of the Revised Statutes of the United States, applicable to all the territories, declares that "the legislative power of every territory shall extend to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States." By an act approved January 23, 1873, entitled "An act regulating the compensation of the members and officers of the legislative assemblies of the several territories of the United States" (section 1855 of the Revised Statutes), it was declared that "no law of any territorial legislature shall be made or enforced by which the governor or secretary of a territory or the officers or members of any territorial legislature shall be paid any compensation other than that provided by the laws of the United States."

By the same act the subordinate officers of each branch of territorial legislatures are specified, and their compensation fixed. This provision (sec. 1861, Rev. Stat.) is as follows: "The subordinate officers of every branch of the legislative assemblies shall consist of one chief clerk, who shall receive a compensation of $8 per day; and of one assistant clerk; one enrolling clerk; one engrossing clerk; one sergeant-at-arms; one door keeper; one messenger and watchman, who shall receive a compensation of $5 per day during the sessions, and no charge for a greater number of officers and attendants, or any larger per diem shall be allowed or paid by the United States to any territory." An act approved June 19, 1878, entitled, "An act making appropriations for legislative, executive, and judicial expenses of the government for the fiscal year ending June 30, 1879, and for other purposes," repealed section 1861, differently entitling some of the subordinate officers, and reducing the compensation of some; but the restriction of said section 1861, to wit, "that no charge for a greater number of officers or attendants, or any larger per diem shall be allowed or paid by the United States to any territory," was reenacted in the words, "and no greater number of officers or charge per diem shall be paid or allowed by the United States to any territory."

It will be observed that the organic act did not specify the officers of the legislature, or their compensation. It did not inhibit payment, in addition to that allowed by the United States, either to the governor, secretary, members of the legislature, or its officers. Nor did any act of congress special to New Mexico, or common to all the territories, until January 23, 1873, forbid such appropriation of the territorial funds, or enumerate the officers allowed and to be paid by the United States. It is logical to conclude—as remedies are not provided, except to cure evils—that the legislators, in the exercise of their power, had regarded pay-

ment to themselves and their officers, and the officers of the other branches of the government, out of the territorial treasury, as rightful legislation, and that congress, though recognizing the power as existing, did not regard it legitimate for trustees of public funds to apply them to their own advantage, and imposed the restriction to prevent the continuance of such abuse; but it does not appear that further restraints as to the disposition of the territorial funds were deemed either essential or legitimate. Congress by the act of January 23, 1873, constrained due regard by public servants of their obligations by the prevention of the application of the funds in their custody to their own benefit, and notified the legislators that it would furnish certain officers, at certain compensation, and that no greater number, or greater charge per diem, would be paid or allowed by the United States. Neither the number nor the pay of the officers having been before specified, congress was bound by the acts of its authorized agents in their organization and operation; and it became imperative, consequently, to limit the liability of the United States for the expenses of these bodies. No limitations, however, upon the legislatures, were expressed either in the act of 1873 or that of 1878; and it is difficult, if not rationally impossible, to infer that, in exempting the United States treasury, congress simultaneously contemplated a protectorate over the fiscs of the territories. No legislation of this nature exists and it can not be created by judicial implication. If a casus omissus, the deficit can not be supplied by the courts. An intention, if, in the opinion of the court, entertained and not expressed by the legislature, is quod voluit non dixit, and can not be enforced. Courts can not assume the functions of legislatures. But, no matter what the status, congress, advising the territorial legislatures that only those officers authorized by it would be paid by the United States, warned them that,

if other persons were employed or appointed, they would not be recognized as claimants against the United States treasury, and no provision would be made for them. It may be said that congress served a caveat upon the legislatures, that at their own risk would they engage other subordinates than those enumerated; and it is submitted that a notice not to act is a recognition of the power, as a right, to act, where the right and power to restrain specifically exist in a superior, and is not exercised. Congress intended to forbid payment, other than that allowed by the United States, to the governor, the secretary, and members and officers of the legislature, and did it, unequivocally. It intended to limit the officers to be paid out of the United States treasury, and did it, distinctly. But did not clearly, or by logical implication, prohibit the employment of. other subordinates, and provision for their payment, by the legislatures, and therefore the conclusion seems irresistible that they did not intend to restrict the legislatures in the exercise of their discretion as to their necessities. It may be readily conceived that congress, having furnished the aid it deemed essential, recognized it as wise not to interfere with the legislatures in further providing for themselves if necessity should develop. The legislatures of territories are, relatively, as absolute within their limits as are those of the states. The latter are restrained by their constitutions and the constitution of the United States; and the others, by the constitution of the United States, and the laws in pursuance thereof, which is but the constitution, in effect. Legislatures of the states are a law unto themselves, within the provisions of their constitutions; and, in their organizations, they are the arbiters of their wants. Legislatures of territories, though dependents and subjects of congress, are, except as restricted by the constitution, and the statutes applicable to them, unrestrained in their right to organize and

provide for themselves. Imposers of taxes, their disbursers, and absolute over them, except in the right to apply them to the increase of their compensation, or that of their officers and the officers of the other branches of the governments, it seems a sequitur too cogent to be denied that it is rightful that they should be permitted to provide themselves with the subordinates they may consider indispensable, or even contributive, to the satisfactory performance of their duties. Absolute in their control of public funds, to the extent of consigning them, in hundreds of thousands, to the construction of public buildings, capitols, penitentiaries, universities, asylums, and other institutions, they are yet, it is contended, estopped from the disbursement of but a trifle, relatively, that, in their judgment, is required for the execution of their trust. Such a deduction seems incompatible with sound reasoning. It is submitted that the correctness of the foregoing view has been demonstrated by the continuous action of congress. It is fundamental that congress, not rejecting territorial legislation, approves it, the corollary of the statute which requires the submission of the acts of the legislature to congress, and declares that "if disapproved they shall be null and of no effect."

Judge COOLEY, in his work on Constitutional Limitations (page 34, note), in regard to territorial legislation declares: "The legislation, of course, must not be in conflict with the law of congress conferring the power to legislate; but a variance from it may be supposed to be approved by that body, if suffered to remain without disapproval for a series of years, after being duly reported to it." The supreme court of the United States, in passing upon the Utah jury law, says: "The simple disapproval by congress, at any time, would have annulled it. It is no unreasonable inference,

TERRITORIAL
legislation:
acquiescence by
congress: inference.

therefore, that it was approved by that body.'' Clinton v. Englebrecht, 13 Wall. 445. The same tribunal declares, ''In a case of a doubtful and ambiguous law, contemporaneous construction of those who have been called upon to carry it into effect is entitled to great respect.'' Edward's Lessee v. Danby, 12 Wheat. 210; 107 U. S. 406. In the case of Lyons v. Woods, 153 U. S. 649, the supreme court of the United States placed the refusal to inquire into the organization of the twenty-fifth legislative assembly of New Mexico on the ground that the attention of congress was called to the circumstances of its organization. It is historical that the territorial legislatures have persistently pursued the practice of creating, for their service, subordinates, in addition to those named by congress; and being cognizant of this action, through the submission of their laws as required by organic acts, congress has not disapproved or condemned it; not denied the right, or censured its exercise, even if excessive. If wrong, it has been permitted to pass current as law by competent and controlling authority, and must be accepted as affirmation tantamount to congressional decree. Says the supreme court of the United States: ''The simple disapproval by congress, at any time, would have annulled it (Utah jury law). It is no unreasonable inference, therefore, that it was approved by that body.'' Clinton v. Englebrecht, 13 Wall. 445. Acquiescence by a party who might have repudiated is ratification.

Again, the practice of congress in the premises must be regarded as its law upon the subject. Its acts indicate its intention, and are the construction of its enactments. .''Usages long established and followed have, to a great extent, the efficacy of law, in all countries. They control the construction, and qualify and limit the force, of positive enactments.'' Slidell v. Grandjean, 111 U. S. 424. It must be conceded that

the custom of adding to their staff by the territorial legislatures has prevailed indefinitely, and without interruption, with the consent of congress, in that it has not dissented; and it has, consequently, obtained the force of law. Says Mr. Justice STORY, "The true and appropriate office of a usage or custom is to interpret the otherwise indeterminate intentions of parties." Were it admitted that the intention of congress in limiting the subordinates to be paid by the United States did not distinctly signify its purpose as to the right of the legislatures to increase them, and compensate them out-of the funds under their control, it is palpable that in failing to disapprove such employment for a series of years, it established an undisputed usage, which must be regarded as its interpretation of its measure. Long and continued usage furnishes a contemporaneous construction which must prevail. Legislatures having assumed and exercised for a protracted period the right to engage additional subordinates, and congress having continuously acquiesced in its exercise, the construction has been practically declared, and doubt can not obtain. Reason and practice uniting in a conclusion, it would seem that it is impregnable.

But, for the sake of argument, let it be admitted that the construction of the statutes under consideration, notwithstanding the action of congress as above recited, is problematical. It is adjudicated that the constitutionality of a law is to be presumed, that reasonable doubts must be solved in favor of legislative action, and that courts should sustain it, when not clearly satisfied of its invalidity. Cooley, Const. Lim. In Fletcher v. Peck, 6 Cranch, 128, Chief Justice MARSHALL declared, "The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." Mr. Justice WASHINGTON, in Ogden

v. Saunders, 12 Wheat. 213, said, "It is but decent respect, due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity until its violation of the constitution is proved beyond all reasonable doubt." If the legislature conceived any doubts as to the legality of its action, it solved them in its favor; and the courts, if sharing in such doubts, must similarly determine them. If such is the principle controlling courts in the construction of statutes generally, a fortiori must it prevail as to enactments · personal to the legislatures, their organization, and requirements. Sole judges of the qualifications of their members, it would seem they are not less competent to settle for themselves the extent of their necessities, and the number of subordinates to meet them. It appears, then, that the right of the legislature to equip itself to its satisfaction is sustained by principle and practice, by congress and the courts. If the practice originated in error, congress is responsible for not correcting it, and the error has existed so long, and been so common, it must have the force and effect of law until legally corrected,—not by judicial legislation, however; not by the intrusion of courts into the portals of a co-ordinate department of the government, supreme in the exercise of authorized functions; but by congress, omnipotent over the legislatures, to control them, either enlarging or abridging their powers. In 12 How. 2, the supreme court says, "It seems to us that the control of these territorial governments appertains to that branch of the government which creates, and can change or modify them to meet its views of public policy, viz., the congress of the United States."

Ours is a government of co-ordinate departments, each, within its sphere, absolute, and exempt from supervision of the others; and the invasion of either,

within the domain of the other, is an infraction dangerous to the preservation of the genius of our institutions, and can not be tolerated. Better the abuse of power by one branch than the assumption of power by another. Courts are disposed to amplify their jurisdiction, even to the extent of encroaching upon the prerogatives of their co-ordinates, and, if not confined to their prescribed limits, would destroy the equilibrium of our political fabric by undue aggression. If injustice has been perpetrated by one department, less the evil of enduring it than the attempt to correct it by another arrogating to itself a province in derogation of fundamental doctrine. If it be permitted to the judicial department to revise the legislative, the one is subordinate to the other, its dignity less, and departures in contravention of our political tenets will be committed. If courts can, by construction, circumvent legislatures in organizing themselves, it will be difficult to impose a limit to interference by such methods. If courts can inject phraseology into statutes to impart an import unexpressed, serious complications will ensue. Legislatures create courts and judges, not to direct their actions, but to enforce their will; and they can not assume judicial functions to reform judicial abuses, but must cure them, either by the removal of the offenders by impeachment, or by legitimate legislation. The judiciary, jealous of their prerogatives, and zealous in their maintenance, should scrupulously abstain from infringing upon those of the associate departments, that each may move in its orbit harmoniously with the others. Excesses may be committed, even to the extremity of corruption; judgment may err, to the degree of folly; public interest may be sacrificed, to extent criminal,— by legislatures, in the exercise of their powers; but, nevertheless, it would be assumption for the courts to impugn their motives, or to assail the policy of their

acts, and usurpation of authority to attempt to restrain their discretion. Endowed with power, the legislatures of states are responsible to the people; of territories, to congress,—to whom they owe their existence, for its proper exercise; and the courts are estopped from inquiring into the wisdom of their action. It is primary principle that that system of law is best which confides as little as possible to the discretion of the judge; that judge the best who relies as little as possible on his own opinion.

This exposition of the relations of the departments of our government, if orthodox, is as true of the territories as of the United State and the states. Congress, in the exercise of its power to dispose of, and make needful rules and regulations, respecting the territories of the United States, created territorial governments, consisting of executive, judicial, and legislative departments, and conferred upon them general legislative power, and, in adopting the forms of the federal and state systems, incorporated with them the theories of such autonomies. In Clinton v. Englebrecht, 13 Wall. 443, it is said: "In all the territories, full power was given to the legislature over all ordinary subjects of legislation. The terms in which it was granted were various, but the import was the same in all." In the same case it is said, "The theory upon which the various governments for portions of the territory of the United States have been organized has ever been that of leaving to the inhabitants all the powers of self-government consistent with the supremacy and supervision of national authority, and with certain fundamental principles established by congress." In Hornbuckle v. Toombs, 18 Wall. 665, it is said: "As a general thing, subject to the general scheme of local government chalked out by the organic act, and such special provisions as are contained therein, the local legislature has been intrusted with the enactment of

the entire system of municipal law,—subject, also, however, to the right of congress to revise, alter, and revoke at its discretion. The powers thus exercised by the territorial legislature are nearly as extensive as those exercised by any state legislature." Congress, in deference to the spirit of our people, and to relieve itself, has endowed the territories with the right of self-government, and subjected them to but few restrictions. Authorized to legislate, it is inevitable that they shall determine upon the subjects for their action, within prescribed limitations; and it is consequential that, because they act, the subject is prima facie rightful. The executive can not dictate subjects, but may recommend them. The courts can do neither. Theirs is the function to administer the laws. "Rightful," as a qualification of "subjects of legislation," is a synonym for legitimate, and does not signify just, legislation,—legislation consonant to justice. A subject may be rightful, but legislation upon it may be wrongful, in that it may be in excess of power; in that it may transcend the limitations of the constitution and laws. It may be legal for a territorial legislature to consider a subject, but the enactment may be extrajurisdictional; and the courts, without infringing upon the privilege of the legislature to elect its subjects, may declare that the limitations imposed by the constitution and laws have been disregarded. Says COOLEY: "The rule of law upon this subject appears to be that, except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice, or not, in any particular case. The courts are not the guardians of the rights of the people, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is

by an appeal to the justice and patriotism of the representives of the people. If this fail, the people, in their sovereign capacity, can correct the evil, but courts can not assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the constitution. It can not run a race of opinions, upon points of right, reason, and expediency, with the lawmaking power. Any legislative act which does not encroach upon the powers apportioned to the other departments of the government, being prima facie valid, must be enforced, unless restrictions upon the legislative authority can be pointed out in the constitution, and the case shown to come within them."

It can not be pretended that the resolution under consideration is any encroachment upon the powers apportioned to either the executive or judicial departments of the territorial government. It having been declared by the supreme court of the United States that the powers conferred by congress upon territorial legislatures, and exercised by them, are nearly as extensive as those exercised by state legislatures, it must be conceded that the foregoing law is not less the rule for the one than for the other. Both are practically absolute, within the prohibitions prescribed. Congress having bestowed upon the territorial legislatures powers but little less, if any, than those inherent in state legislatures, it follows that the said bodies occupy a relation to the other departments of territorial governments corresponding to that which has prevailed in the states since the foundation of the government. There has been no adjudication by the supreme court of the United States antagonizing this as the status of territorial legislatures, and decisions of subordinate tribunals in conflict must be regarded as erroneous. A court that, in construing the provisions of the organic law conferring power on a territorial legislature, applies the rules of construction applicable

to similar provisions in municipal charters, so conceives the nature of territorial legislatures that it logically adopts a rule of construction for territorial statutes more rigorous, less liberal, than for laws made by state legislatures, characterized as sovereign, though they do not possess the attributes of such supremacy. The supreme court of Arizona, in this assumption,—to be found in Territory v. Daniels, 22 Pac. Rep. 159, and Ellison v. Lindford, 25 Pac. Rep. 744,—enunciates an anomaly. The supreme court of the United States has not so degraded territorial legislatures, nor is there any decision of that august tribunal even faintly suggesting such inferior status for them. Territorial legislatures confer charters, create corporations. The charters involved in Territory v. Daniels and Ellison v. Lindford, 25 Pac. Rep. 744, were adjudged unconstitutional because, in the extension of corporate limits, lands miles from the town, and not advantaged, were heavily taxed, and private property was thus taken without compensation. Had the charters been granted by congress they would have been declared void, by similar adjudication, for the same reason. The supreme court of the United States, in Lindford v. Ellison, 155 U. S. 159, recited the facts and rulings of the cause of Ellison v. Lindford, in the court below, but did not approve the dicta contained, or pretend to consider them, and simply sustained the motion to dismiss for want of jurisdiction. It must be recognized that the supreme court would not inferentially recede from its position that the powers exercised by territorial legislatures are nearly as extensive as those exercised by the legislature of any state.

Imbued with the views we have enunciated, and endeavored to fortify by reason and authority, we have reached the conclusion that the power of the legislature to act for itself in providing subordinates in addition to those furnished by congress has not been restricted,

either expressly or by intendment, by any act of congress, and consequently that the joint resolution under consideration is an enactment within the power and discretion of the legislature, under the organic act, and can not be annulled by the courts. We beg to refer to the decision of the supreme court of Oklahoma (Braithwaite v. Cameron, 38 Pac. Rep. 1084) for a well-considered analysis of the acts to which we have referred, and a vigorous support of our conclusions. The judgment of the lower court is therefore reversed, and it is hereby decreed that an order dissolving the injunction granted shall be duly entered upon the journal of this court.

COLLIER, HAMILTON, and BANTZ, JJ., concur.