400 P.2d 956

STATE of New Mexico on the relation of Frank R. GOMEZ et al., Relators,

v.

Jack M. CAMPBELL, as Governor et al., Respondents.

No. 7678.

Supreme Court of New Mexico.

March 8, 1965.

Rehearing Denied April 28, 1965.

Seth, Montgomery, Federici & Andrews, Santa Fe, Fred C. Hannahs, for relators.

Earl E. Hartley, Atty. Gen., Frank Bachicha, Jr., Jay R. Rosenthal, Asst. Attys. Gen., Santa Fe, for respondents.

CARMODY, Chief Justice.

In this original proceeding in mandamus, relators seek to require the governor and eleven state boards or commissions to return, and thereafter maintain, the main offices of the agencies at the capital and not elsewhere.

The fundamental question involved relates to the meaning of art. V, § 1, of the New Mexico Constitution, i. e., whether the constitution makes it mandatory that all officers of the executive department maintain their offices at the capital.

All of the respondents, other than The Honorable Jack M. Campbell, Governor, are duly appointed state and public officers and constitute the governing members of the various state agencies named. The principal offices of each of these eleven agencies are maintained in Albuquerque, New Mexico, rather than Santa Fe, the state capital. The relators (fourteen in number) are residents, citizens, qualified electors and taxpayers of the city and county of Santa Fe, who, on behalf of themselves and other citizens of the state similarly situated, demanded of the attorney general that he institute appropriate action to obtain the removal to Santa Fe of all offices of agencies of the executive branch of the state government, which offices were maintained at places other than Santa Fe. In response to this request, the attorney general declined to take any action and suggested that, inasmuch as the question was of great moment and would ultimately reach the courts, therefore relators should present the matter for court determination "with all due speed."

It has been stipulated that any formal demand made upon the governor or any of the other respondents to move their main

offices to Santa Fe would have been refused. The parties have also agreed that there are approximately 286 employees of the state agencies, whose jobs or positions might be directly affected by a decision favorable to the relators; and it has been stipulated that the issue as to whether the constitution requires that all agencies of the executive branch of the state government (other than necessary district offices) must be maintained within the city of Santa Fe is of great moment, and that this question is of great public interest, not only to the citizens of Santa Fe, but to the entire state.

The alternative writ of mandamus, in addition to stating what we have above related, alleges that the cause of action pertains to the general public, affects the sovereignty of the state and the constitutional rights of its citizens, and is of general interest to and affects the rights of relators in common with those of the general public; that the relators and the general public are beneficially interested in the enforcement of the provisions of the constitution. The alternative writ further states (although denied by respondents) that the provisions of art. V, § 1, of the New Mexico Constitution clearly establishes that there is a duty to maintain all of the offices of the defendant agencies, including their public records, books, papers and seals, in Santa Fe. Relators claim that the duty established by the constitution and the Enabling Act is clear, definite and fixed, is merely of ministerial character, calls for no exercise of administrative judgment or discretion, does not relate to political matters, and that there is no valid excuse for the respondents' failure to perform such a duty.

There are also general allegations made by relators, which they claim require the assumption by this court of jurisdiction of the case. These have to do with the applicability of the venue statute (§ 21–5–1 (G), N.M.S.A.1953), relating to suits against state officers; the fact that the employees of the agencies are directly affected and are therefore uncertain as to the location of their employment; that it is questionable whether the district courts have jurisdiction in a case against the governor; that until there is a determination of the problem, the state will be unable to intelligently program its future office space requirements; problems involving the expiration of present leases; that the expenditure of public funds for rental and lease payments at places other than Santa Fe constitutes a misapplication of public funds; and, lastly, that it is for the best interest of the general public that the issues be resolved at an early date.

We also take note of the allegation in the petition for the writ and the alternative writ that the attorney general's office in 1959 rendered an opinion, which held that the unemployment security commission was a part of the executive branch of the state government and could not maintain its

principal office at a place other than Santa Fe. There has been no compliance with this opinion, and, although the same has not been withdrawn or superseded by the attorney general, that office, in this present litigation, takes a position directly contrary to that stated in the mentioned opinion.

The constitutional provision with which we are here concerned is, as stated, § 1 of art. V of the Constitution, the entire article bearing the title of "EXECUTIVE DEPARTMENT." The section involved reads as follows:

"The executive department shall consist of a governor, lieutenant-governor, secretary of state, state auditor, state treasurer, attorney-general, superintendent of public instruction and commissioner or [of] public lands, who shall be elected for the term of two years beginning on the first day of January next after their election.

"Such officers shall, after having served two consecutive terms, be ineligible to hold any state office for two years thereafter.

"The officers of the executive department except the lieutenant-governor, shall during their terms of office, reside and keep the public records, books, papers and seals of office at the seat of government."

We first address ourselves to the standing of relators to maintain this action. In this connection, we believe that the case law in New Mexico is sufficiently clear as to make it unnecessary to discuss the many cases cited from other jurisdictions.

Relators' principal reliance is upon Hutcheson v. Gonzales, 1937, 41 N.M. 474, 71 P.2d 140, which was (as is the instant case) an original proceeding in this court. There the suit was brought by a private citizen, resident and voter of Bernalillo County against the secretary of state, and sought to require the secretary of state to publish proposed constitutional amendments before a special election, although she had declined to do so, upon the advice of the attorney general, contending that the receipt of referendum petitions suspended the legislative act calling the special election and automatically "deferred" the proposition until the next general election. This court, in an exhaustive opinion, made the writ permanent and, in the course of that opinion, discussed the relator's capacity to sue. Although much is said in Hutcheson as to capacity to sue, nevertheless it seems clear to us that the principal reason that the court accepted jurisdiction was that the case related to the exercise of a private right, i. e., the voting franchise, not only by the relator there, but by all others similarly situated. The court, in Hutcheson, although recognizing the rule that in the absence of some controlling necessity the court should decline jurisdiction in all cases brought at

the instance of a private suitor (State ex rel. Owen v. Van Stone, 1912, 17 N.M. 41, 121 P. 611), recognized, however, that exceptions exist where the case " 'is publici juris; that is, a case which affects the sovereignty of the state, its franchises or prerogatives, *or the liberties of its people.'* " The right to vote on an amendment to the constitution is one of the liberties of the people of the state of New Mexico, and therefore placed Hutcheson within one of the exceptions to the rule. Similarly, State ex rel. Burg v. City of Albuquerque, 1926, 31 N.M. 576, 249 P. 242, related to the right to vote. Thus we do not feel that either case is authority sustaining relators' position here. There is no question in this case relating to the elective franchise or the right to vote—it is merely a problem of constitutional construction.

To our way of thinking, the case of Asplund v. Hannett, 1926, 31 N.M. 641, 249 P. 1074, 58 A.L.R. 573, although differing materially from that before us, contains the answer to the immediate problem. The court stated:

"* * * So we seem to have two questions: The first, whether a citizen may appeal to the courts to prevent a violation of the Constitution; the second, whether a taxpayer may apply to them to prevent misuse of public funds."

The court then directed its attention to the first question above, and concluded that a citizen is without standing to question the constitutionality of a statute. In reaching this result, we pointed out in Asplund that the courts are not constituted as a reviewing authority over the other departments of the state, or as guardian of the constitution, and relied upon Baca v. Perez, 1895, 8 N.M. 187, 42 P. 162; Kelley v. Marron, 1915, 21 N.M. 239, 153 P. 262; and Asplund v. Alarid, 1923, 29 N.M. 129, 219 P. 786.

In Asplund v. Hannett, supra, we quoted from the opinion in Asplund v. Alarid, supra, and we hereafter repeat this quotation, although inserting in brackets the word "executive" in lieu of the word "legislative," so as to make it plain that the quotation applies equally to the instant case to the "executive" as it did to the "legislative" in Asplund v. Alarid, supra:

"It is not the duty of this or any other court to sit in judgment upon the action of the * * * [executive] branch of the government, except when the question is presented by a litigant claiming to be adversely affected by the * * * [executive] act on the particular ground complained of."

We are fully aware that Asplund v. Hannett, supra, was an appeal in an injunction proceeding, wherein it was sought to prevent the expenditure of certain state funds. Nevertheless, the discussion in that opinion respecting the right of a citizen to chal-

lenge a violation of the constitution applies equally to the case before us.

We conclude that relators are without standing to raise the constitutional question here involved.

We note, of course, that relators also to some extent rely upon the contention of misapplication of public funds, and in this connection also the case of Asplund v. Hannett, supra, is decisive, i. e., that relators have no standing as taxpayers to raise the question in this proceeding. See also Kuhn v. Burroughs, 1959, 66 N.M. 61, 342 P.2d 1086.

 In the last analysis, relators are, in one sense, seeking an advisory opinion, asking that their construction of the constitutional provision prevail, although, to us, it is not subject to the mandatory meaning contended for by relators. To ask the court to sit as a final arbiter of all actions of the executive and legislative departments is not in accordance with our scheme of government. The power of the courts is a judicial power, to hear and determine causes of action. The courts cannot generally review or interfere with the acts of the legislative or executive departments as a special guardian of the constitution, and our power is to enforce the supremacy of the constitution only when legislative enactments or executive proceedings are plainly violative of the constitution, and then only upon suit by one directly and adversely affected thereby.

Asplund v. Alarid, supra. It should be plain that, rather than to apply to the courts for relief, relators have other remedies such as through the elective process or appealing to the legislature. It is our considered judgment that relators have no standing before us to seek the remedy urged. Other cases from this jurisdiction, in addition to those above-mentioned, which have been cited by relators, do not, in our opinion, require a different conclusion than that here announced, because those cases concern proceedings initiated against local or county officials, not against the state or its executive officials.

 However, we would be remiss in our duty to the public, as well as to relators, if we did not decide the basic question. We do so, although recognizing that it is a rule of long standing that courts refuse to pass upon questions of constitutional interpretation except when it is necessary to dispose of the case at hand. However, upon rare occasions involving questions of great public interest, the court may, in its own absolute discretion, proceed to determine the question. See State ex rel. West v. Thomas, 1956, 62 N.M. 103, 305 P.2d 376; State v. Friedkin, 1943, 244 Ala. 494, 14 So.2d 363; and Sarlls v. State, 1929, 201 Ind. 88, 166 N. E. 270, 67 A.L.R. 718. Although not without reluctance, in our judgment the instant case is a proper one for such a determination. See Hammond v. Bingham, 1961, 83 Idaho 314, 362 P.2d 1078, wherein the Su-

preme Court of Idaho, in an original proceeding in mandamus, decided a constitutional question, though not essential to the final decision. See also Luker v. Curtis, 1943, 64 Idaho 703, 136 P.2d 978.

■ It has for many years been urged by some people that the maintaining of the offices of certain boards outside of the limits of Santa Fe is unconstitutional. The position taken has not been without some official support. At least three opinions of the attorney general have been to the effect that state agencies should be headquartered at Santa Fe. See Att'y Gen.Op. No. 5914, dated March 8, 1954, with reference to the racing commission; No. 57–46 dated March 8, 1957, as to the commission on alcoholism; and No. 59–19 dated March 3, 1959, as to the employment security commission. However, the legislative history as to statutes creating various commissions is quite inconclusive. Some of the statutes specifically provide that the office be maintained and meetings held in Santa Fe, although the majority of the statutes creating commissions either contain no mention as to where the office is to be maintained, or it is provided, in effect, that meetings of the commissions shall be held "at such places as may be necessary or as may be agreed upon." In the statutes creating the respondent commissions, only one affirmatively requires the maintenance of its principal office in Santa Fe, this being the New Mexico dry cleaning board (§ 67–18–3, N.M.S.A.1953). (What appears

to be a clear violation of the legislative mandate is a matter upon which the proper officials should take some action.) In any event, it can hardly be said that there has been any legislative policy followed through the years which could be considered as persuasive as to any expression of a legislative interpretation that § 1 of art. V of the Constitution is mandatory, insofar as requiring boards or commissions to maintain their offices and records at the capital and not elsewhere.

■ Not desiring to add to the confusion, it should be noted that the office of inspector of mines was created by the Constitution, art. XVII, § 1, although the omission of this state official from the list of executive officers appearing in § 1 of art. V is obvious. One of the respondents here is termed "State Mine Inspector," and the statute under which this office is operating contained no mention of the fact that the office should be in Santa Fe; in fact, contrariwise, by ch. 203, § 3, Sess.Laws 1947, the statute provided that the director of the New Mexico bureau of mines and mineral resources should provide a suitable office for the state inspector of mines. Ch. 82, § 2, Sess.Laws 1953, states that the state of New Mexico "shall provide a suitable office." Three respondent commissions were in existence prior to the adoption of the constitution, these being the cattle sanitary board, the sheep sanitary board, and the board of pharmacy. The cattle sanitary board and

the board of pharmacy were initially established in 1889, and the sheep sanitary board in 1897. In the creative statutes of the cattle sanitary board and the board of pharmacy, there is no mention as to where the principal office should be maintained, nor does this appear in any of the subsequent amendments with respect to these boards. Not so, however, as to the sheep sanitary board. The board itself was originally established under the provisions of ch. 52, Sess.Laws 1897, and two years thereafter, by ch. 33, § 1, Sess. Laws 1899, the territorial legislature provided for the organization of the board and its principal office. The act, in part, provided:

"As soon as possible after their organization, the board shall select and designate some place in the Territory as its principal office and place of business, * * * but may be changed thereafter from year to year, by the selection of some other place at the discretion of the board."

This section, although the word "territory" was changed to "state" in the 1915 Code, remained in our laws until the passage of ch. 188, Sess.Laws 1951, at which time the section was repealed and at present there is no provision as to the location of the principal office. Thus, with respect to the positive direction of the territorial legislature with reference to the sheep sanitary board and the lack of any specification as to offices of the cattle sanitary board and

board of pharmacy, consideration must be given to the fact that the constitution makers had constructive knowledge of the territorial laws and their content. Such knowledge amounts to a practical construction of the section by the constitution makers, which must be given great weight. See 1 Cooley's Constitutional Limitations, 8th ed., page 144, wherein it is said:

"* * * Indeed, where a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention. * *"

Relators urge that action taken in the 1959 session of the legislature amounts to a showing of legislative construction that all executive offices must be in Santa Fe. In this connection, at that session of the legislature a constitutional amendment was proposed which provided for the amendment of art. V of the Constitution by adding a new § 15 thereto. The proposed new section would have authorized the maintenance of offices of all legislative-established executive officers and agencies at such places within the state as the legislature might determine by a three-fifths vote of the members of each house. However, at the time the amendment was submitted to the people

at the general election in November of 1960, it failed to receive the necessary majority and was not adopted. The fact that the proposal did not even purport to amend the third paragraph of § 1 of art. V of itself seems to negative the reliance placed upon the legislative construction argued for by relators.

In Pollack v. Montoya, 1951, 55 N.M. 390, 234 P.2d 336, it was determined that the chief of the division of liquor control of the bureau of revenue was a state officer and, as such, could only be sued at the state capital. Relators derive great comfort from a statement in the Pollack opinion to the effect that art. V, § 1, of the Constitution does not deprive the legislature of the power to create other "executive officers." The question in Pollack was not whether Mr. Montoya was an executive officer, but rather whether he was a state officer within the provisions of the venue act, requiring that suits be brought against him at the capital (§ 21–5–1(G), N.M.S.A.1953). Whether state officers and executive officers are one and the same, we do not deem it necessary to decide. We are not persuaded that there is any conflict between Pollack and the determination here announced. As a matter of fact, the statement so strongly relied upon by relators in Pollack, supra, was to the effect that art. V, § 1, " * * * does not necessarily deprive the Legislature of the power to create other executive officers, * * *." The opinion then referred to

art. V, § 5, as the section of the constitution recognizing and providing for the appointment of all officers whose appointment or election was not otherwise provided for.

All of the parties agree that Santa Fe is the capital of New Mexico and the seat of government; they also agree that the officers specifically named in § 1 of art. V of the Constitution must reside and keep the public records at the seat of government. The point of departure between the parties is whether all officers who perform an executive function are thereby officers of the executive department contemplated by the third paragraph of § 1. Each of the parties takes solace from the lack of specificity in the constitutional provision. They admit that the framers were aware that there would be the subsequent creation of additional executive offices, but relators claim that if it was intended by the constitution makers to treat future executive officers differently, then it would have been so provided. However, respondents declare that inasmuch as the constitution makers failed to include a provision, clause or phrase in this section as to future executive officers, that it was thereby intended that the provision apply to only those specifically named.

We would observe that it is somewhat difficult to read the first few words of the third paragraph of § 1 of art. V of the Constitution, i. e., "The officers of the

executive department * * *," in any way except in context with the provisions of the first and second paragraphs of the section. Actually, § 1 as originally adopted was only in two paragraphs; and what is now the third paragraph of this section, following amendment by the people in 1914, was the second sentence of what was originally the second paragraph of the section. Therefore, no matter what one might think in retrospect, it is hard to imagine that the constitution makers, in the preparation of this entire section, had any officers in mind other than those specifically named in the first paragraph of the above section. This is not to say that the constitution makers in any sense intended to restrict the creation of additional executive officers, but only to specifically provide that the elective officials named must live and keep all of their records at the seat of government. We again call attention to the fact that even the 1959 proposed amendment did not seek to change the wording of § 1 in any way, but merely proposed to add an entirely new section to art. V itself. Thus it would seem that the legislature was proposing an updating of the executive section of the constitution, to provide for subsequently-created statutory executive offices, rather than suggesting a change in the basic law originally adopted by the people. We make these statements in order to lay at rest a long-smoldering controversy over the construction of this particular section, and observe that the intention which we attribute to the constitution makers is made plain when certain other provisions of art. V of the Constitution are considered. Thus § 3 provides for the qualifications of the officers specified in § 1, and § 12 refers to the compensation of the officers mentioned in § 1. It is a little too much to believe that the constitution makers, having been so specific as to the officers named in § 1 and referred to in §§ 3 and 12, could have contemplated that what now appears as the third paragraph of § 1 was intended to be embracive of all executive officers of the state. The very format of our constitution, both as to the contested paragraph being included as a part of § 1, as well as the fact that §§ 3 and 12 make reference to § 1, in our judgment completely distinguishes the case before us from the one so strongly relied upon by relators, State ex rel. Lemon v. Langlie, 1954, 45 Wash.2d 82, 273 P.2d 464. This is true, even were we to favor (which we do not) the approach adopted by the majority of the Washington court in that 5–4 decision. We would observe, however, that, as pointed out in the dissent in the Langlie case, there is an obvious distinction between officers created under the constitution itself and executive officers created by statute. The latter are creatures of the legislature, and even though operating as a part of the executive department, may have their duties changed or their offices abolished at any time the legislature so desires. Compare

Pollack v. Montoya, supra; see Black v. Sutton, 1945, 301 Ky. 247, 191 S.W.2d 407. Not so with a constitutionally-created office, such as those named in § 1 of art. V. All of the respondent boards fall within the category of offices created by statute, and it is particularly noteworthy that the cattle sanitary board, the board of pharmacy and the sheep sanitary board were so created before the adoption of the constitution. We note that respondent Governor, as well as all of his predecessors in office, have similarly construed the constitution as is evidenced by the fact that some of the respondent agencies have been maintained away from Santa Fe continuously since statehood. This could not have been done without the approval of the Governor. Certainly we must attribute to these elected officials as sincere a desire to comply with their oath to support the constitution as did we when we swore to that solemn declaration.

We make the above observations to point up the fact that the necessity of construction of the paragraph involved raises serious questions having to do with relators' right to any judicial remedy as distinguished from a political right. It can hardly be said, relators to the contrary notwithstanding, that there is any clear, plain mandatory duty on the part of respondents to return and maintain their main offices at the capital of the state of New Mexico.

What we have said is our considered judgment, which needs to be stated in order that an unseemly controversy may be forever laid at rest. Santa Fe, the oldest seat of government in the entire United States, is the capital for all the people of New Mexico; it is as much a part of our cherished heritage as is our history from the days of DeVargas; the mere fact that, apparently for efficiency purposes, a relatively few boards or commissions are located at places other than the state capital will not make it otherwise. However, we do not reach in this proceeding any question as to whether the locating of executive departments outside of Santa Fe, if pursued to an unreasonable extent, might be in violation of art. XXI, § 6, which makes Santa Fe the capital of the state.

What we have said makes it unnecessary for us to determine the other questions raised by relators, and the alternative writ of mandamus, having been improvidently issued, will be discharged. It is so ordered.

MOISE and COMPTON, JJ., concur.

CHAVEZ AND NOBLE, JJ., dissenting.

CHAVEZ and NOBLE, Justices (concurring in part and dissenting in part).

We agree with the majority that the basic question of whether the Constitution requires all executive officers to maintain their principal offices at the Capitol is one

of great public importance and one which this court, in the exercise of its discretion, should determine. However, we are firmly convinced that the majority have reached an erroneous result in their construction of the constitutional provision and that their construction is based upon faulty reasoning.

It goes without saying that this court is not concerned with the wisdom or desirability of maintaining certain offices at any particular location, or with whether their location at some place other than the Capitol may be in the interest of efficiency. Our function is solely to interpret the provisions of the Constitution which bear upon the authority of the respondents (other than the governor) to act in the premises. The problem is purely one of constitutional interpretation.

The Supreme Court of Washington, in State ex rel. Lemon v. Langlie, 45 Wash. 2d 82, 273 P.2d 464, had before it the identical question with which we are faced, and held that a proper construction of the language required all executive officers to maintain their principal offices at the seat of government. The Washington Constitution provided that:

"The governor, secretary of state, treasurer, auditor, superintendent of public instruction, commissioner of public lands and attorney general shall severally keep the public records, books and papers relating to their respective offices, at the seat of government, * * *."

A comparison of this language with our Constitution reveals that the Washington provision is much more susceptible of a narrow and exclusionary interpretation than is our provision.

Our brothers on the court place great reliance upon the dissenting opinion in State v. Langlie, supra, and particularly upon the distinction contained therein between constitutionally-created officers and those created by the legislature. It is undeniable that legislatively-created offices may be changed or abolished by the legislature, while that body has no such control over those offices created by the Constitution. But what effect does this distinction have upon a proper interpretation of the language before us? It is clear to us that whether an office may be abolished or its duties changed has no bearing upon whether such an officer, if created by the legislature, must maintain his office at the seat of government.

An analysis of the Langlie dissent illustrates that the position of the dissenters is not actually supported in the authorities relied upon, for State ex rel. Grant v. Eaton, 114 Mont. 199, 133 P.2d 588, clearly does not sustain the distinction as applied in Langlie or as applied to the instant case by the majority. The sole question in Eaton

was whether the legislature could constitutionally provide for the appointment of a "standby" officer to perform the duties of a constitutional officer who had been called into the armed forces but had not resigned his office. The Montana Constitution provided that offices in the legislature could be filled by appointment only upon death of the incumbent. Eaton held that the legislature was not empowered to enlarge upon the constitutional authority concerning an office created by the Constitution, and laid down the distinction between such offices and those created by the legislature. Any similarity between the question involved there and the one before this court is imagined.

We now turn to the reasoning by which the majority assert that the legislature has interpreted Art. V, § 1, as not restricting the location of executive officers subsequently created by that body. This court held in Pollack v. Montoya, 55 N.M. 390, 234 P.2d 336, that the executive department is not restricted to those officers named in the first pararaph of Art. V, § 1, but that the legislature is authorized to create additional executive officers. It is thus quite apparent that the framers of the Constitution did not intend either to specify all of the executive officers or to prohibit the creation of others from time to time as the need might arise. It follows that failure to specifically name certain of the boards then in existence does not show an intention on the part of the framers that Art. V, § 1, was inapplicable to such officers or to others later created by statute.

We must remember that the function of a constitution is to establish the framework and general principles of government, rather than to provide the details which are left to specific legislation. Certainly the general language "[t]he officers of the executive department * * *" is sufficiently broad to indicate an intention by the framers of the Constitution that it apply with equal force to all officers of that department, no matter when or by whom created.

The failure of the legislature, once the Constitution had been adopted, to require such boards to maintain their principal offices at the seat of government by affirmative legislative mandate cannot be logically construed to amount to a legislative interpretation that such statutorily-created officers need not locate at the Capitol. Indeed, the fact that the legislature has not sought to direct any of the legislatively-created officers to establish their offices away from the Capitol is much more persuasive of an interpretation by that body that it does not have the right to do so. Furthermore, the restriction of the Constitution as to location of executive offices is self-executing and requires no legislation to make it effective.

The majority find a persuasive legislative interpretation that statutorily-created executive officers need not locate at the seat

of government from the fact that in 1959 an amendment was proposed to Art. V, § 1, which would have authorized the maintenance of offices of all legislatively-established executive officers at such places within the state as the legislature might determine. On the contrary, the mere fact that the legislature thought it necessary to propose an amendment to this section to empower it to locate such statutorily-created officers away from the seat of government is strong evidence of an interpretation by that body that, under the existing constitutional provision, the legislature was without authority to direct any such officer to locate at a place other than the Capitol. Furthermore, the failure of the people to adopt the proposed amendment is likewise strong evidence of an interpretation by the people of New Mexico that the existing Constitution prohibited location of such officers at places other than the seat of government, and that the people did not want to withdraw such constitutional restriction on the legislative right to direct the location of such offices.

The proper rule to be applied in the interpretation of constitutional language was set forth by this court in Flaska v. State, 51 N.M. 13, 177 P.2d 174, where it was said:

"'The language of a Constitution is not to be limited to the precise things considered therein, but it embraces other things as they come into being of the same general nature or class.' * * *

"'* * * Accordingly, it should not receive too narrow or literal an interpretation, but rather the meaning given it should be applied in such a manner as to meet new or changed conditions as they arise.'"

We applied the Flaska rule of interpretation in Pollack v. Montoya, supra. In view of the construction in Pollack of the very provision now under consideration, it is only natural to conclude that the framers of the Constitution likewise intended its mandatory provision to apply to such additionally-created officers. We think that is manifest from the choice of words employed by the constitutional framers. It will be observed that, while the first paragraph of Art. V, § 1, named the principal executive officers then in existence, it then proceeded by the next sentence to limit such named officers to two consecutive terms in office by stating that: *"Such officers * * * shall be ineligible to succeed themselves * * *."* But in the paragraph restricting the location of officers of the executive department, the drafters intentionally did not limit its effect to "such officers" as in the preceding sentence, but employed the broad term "[t]*he officers* of the executive department * * * shall * * * keep the public records * * * at the seat of government."

A long-established guideline in constitutional construction was very aptly put in Payne v. City of Racine, 217 Wis. 550, 259

N.W. 437, where the Supreme Court of Wisconsin explained that:

"'Words or terms used in a constitution, being dependent on ratification by the people, must be understood in the sense most obvious to the common understanding at the time of its adoption, * * *. [I]t is presumed that words appearing in a constitution have been used according to their plain, natural, and usual signification and import, and the courts are not at liberty to disregard the plain meaning of words of a constitution in order to search for some other conjectured intent.' * * *

"'* * * the courts are not inclined to adopt such a technical or strained construction as will unduly impair the efficiency of the legislature to meet responsibilities occasioned by changing conditions of society, but it is proper to assume that a constitution is intended to meet and be applied to new conditions and circumstances as they may arise in the course of the progress of the community. * * *'"

See, also, Flaska v. State, supra; Scribner v. State, 9 Okl.Cr. 465, 132 P. 933; Gaiser v. Buck, 203 Ind. 9, 179 N.E. 1; People v. Western Air Lines, 42 Cal.2d 621, 268 P.2d 723; Knight v. Hollings, 242 S.C. 1, 129 S.E.2d 746; 1 Story on the Constitution, 5th Ed., § 451.

Giving to these words their plain and common-sense meaning, and taking into account the manner in which they were used, it is at once apparent that the framers of the Constitution, and the people in adopting it, certainly had in mind the future growth of the state, that new conditions would arise, and that it might well be that the legislature would create additional executive officers. The words "such officers" obviously refers to those named in the preceding paragraph. Had the framers intended to limit the last paragraph to those named officers, they would undoubtedly have repeated the words "such officers." The natural meaning of the section as a whole, considering the different language employed, clearly shows that a different meaning was intended when the words "the officers of the executive department" were used. This language must be interpreted in the light of the admitted intention that the executive department could be enlarged by the legislature. With such factors in mind, the only logical interpretation is that the last paragraph of Art. V, § 1, was intended to apply to all officers of the executive department, no matter when or by whom created. That is its natural meaning and we think the meaning conveyed to the average person voting on adoption of our Constitution.

The majority say that the third paragraph of § 1 is not to be given a broader interpretation than the first paragraph. Since the first paragraph has been held to contemplate enlarging the number of executive offices, there would seem to be no reasonable

basis for holding that the third paragraph should be restricted only to the eight expressly named. Such construction would be giving it a more narrow interpretation than the portion to which it is said to apply, contrary to the rule of Flaska.

We think Art. V, § 1, of the Constitution requires the principal offices of all executive officers to be located at the seat of government. We, therefore, concur with that portion of the majority opinion holding that the question is one of great public importance and should be determined, but we dissent from that portion of the opinion interpreting the Constitution as only requiring executive offices created by the Constitution to be located at the seat of government.