## In re CONSUMERS POWER COMPANY SECURITIES LITIGATION.

### No. 83–CV–6448–AA.

United States District Court, E.D. Michigan, S.D.

Sept. 30, 1985.

See also, D.C., 105 F.R.D. 583.

Arthur N. Abbey, Abbey & Ellis, New York City, Gene Mesh, Gene Mesh Co., L.P.A., Cincinnati, Ohio, Roger E. Craig, Craig, Farber, Downs & Dise, Detroit, Mich., Fred Taylor Isquith, Wolf Haldenstein Adler Freeman & Herz, New York City, Stanley R. Wolfe, Karen Orman, Berger & Montague, Philadelphia, Pa., David Bershad, Milberg Weiss Bershad Specthrie & Lerach New York City, Herbert B. Newberg, Herbert B. Newberg, P.C., Alvin J. Ivers, Steven M. Cramer, Philadelphia, Pa., for plaintiffs.

James J. Hagan, Simpson, Thacher & Bartlett, New York City, Ronald S. Holliday, Dykema, Gossett, Spencer, Goodnow

& Trigg, Detroit, Mich., for defendant Morgan Stanley & Co., Inc.

James K. Robinson and Ronald S. Longhofer, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for defendant Consumers Power Co., and individual defendants.

E. Edward Hood, Burke, Renneel & Hood, Steve Caine, Ann Arbor, Mich., for defendants.

## MEMORANDUM OPINION
## AND ORDER

STEVEN D. PEPE, United States Magistrate.

This matter involves a review of a protective order entered by this Court on stipulation of the attorneys representing the plaintiffs' executive committee, defendant Consumers Power and defendant Morgan Stanley. The case involves a securities fraud class action over certain representations regarding the Midland nuclear power plant being built by Consumers Power. Booth Newspapers, Inc., has moved to intervene under Fed.R.Civ.P. 24(b) to challenge the legality of the protective order asserting:

> Reporters from the Ann Arbor News have been denied access to discovery documents transmitted by and between the parties due to the existence of [the] Protective Order dated December 7, 1984.

They seek only a removal of the protective order, not an order for production of discovery documents.

The motion involves two issues. The first issue is whether newspapers that are not parties to a lawsuit have standing to intervene for purposes of questioning a protective order which prohibits parties from revealing to the press certain information that it may wish to report to the general public. Assuming that Booth Newspapers has standing to raise this issue, the second question is whether the present protective order is justified under the Federal Rules of Civil Procedure and under the United States Constitution.

### 1. *The Issue of Standing to Intervene:*

Booth Newspapers asserts a common law right of access to pretrial documents exchanged among the parties in preparation for a trial. Booth asserts standing as a necessary predicate to raising the question of access.

Defendant Consumers Power asserts that the public, or the press acting on the public's behalf, does not have standing to be heard unless "it has been excluded from proceedings or records to which it has an established right of access." It reads *In re Knoxville News-Sentinel,* 723 F.2d 470 (6th Cir.1983), to provide standing to be heard only to: (1) persons present in open court when their exclusion from the courtroom is being considered; and (2) to the public and press "before being denied their presumptive right of access to judicial records." Consumers Power argues that in the present case the pretrial materials that are exchanged between the plaintiffs and defendants have not yet been filed in court and are thus not "judicial records". (See the discussion of Fed.R.Civ.P. 5(d) below showing that filing dates of discovery do not necessarily define "judicial records".) Accordingly, it asserts that the standing suggested by *In re Knoxville News-Sentinel* does not exist in the present case since the items in question are presently neither judicial documents nor public court records.

*In re Knoxville News-Sentinel* was dealing with a situation where certain exhibits had been removed from the court record by court order prior to allowing public inspection. The Sixth Circuit noted that "given the important rights involved", it was concerned about the "failure of the district court to afford the press a reasonable opportunity to state their objections to its protective order." In addition, it noted that it would not give the ordinary deference to the district court's decision and use a "narrow review reserved for discretionary decisions based upon first-hand observations." Rather, it indicated that "only the most compelling reasons can justify non-disclosure of judicial records."

The implications of the *Knoxville* ruling have been altered in part by *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). Yet the Supreme Court altered only the standard of review, not the Sixth Circuit's declaration of a right of the public or press to a limited standing in court to challenge protective orders and assert the public's right of access.

While Booth Newspapers has moved to intervene under Fed.R.Civ.P. 24(b), it limits its purposes to vacating the protective order. Rule 24(b) is appropriate for a party who wishes to become a full-time participant in the litigation. In light of the important first amendment right involved in cases where the court has entered protective orders restricting information flow to the public, *In re Knoxville News-Sentinel* recognized a special, limited purpose intervention to provide the press and/or public a reasonable opportunity to state objections to a protective order or other obstacle to access to certain information involved in a litigation.

Noting that other courts had extended the right to be heard to situations other than the closing of the courtroom, the Sixth Circuit felt that its earlier holding of *Brown and Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165 (6th Cir.1983):

> ... invites application of a similar rule where a district court is requested, either in writing under seal or during an in chambers conference, to seal its record.

The Sixth Circuit noted that with respect to the records involved in the litigation:

> ... the district court below was well aware of the public's interest in the litigation between [the parties]. After receiving the bank's request to seal the record, the district court had an obligation to consider the rights of the public and the press.... In our view, the district court should not be placed "in the position of sole guardian of first amendment interest even against the express wishes of both parties." Younger, *The Sheppard Mandate Today: A Trial Judge's Perspective* 56 Neb.L.Rev. 1, 6–7

(1977), *quoted in* [*U.S. v.*] *Criden II*, 675 F.2d [550] at 558 [ (3rd Cir.1982) ]. Rather, the public and press should be afforded, where possible, an independent opportunity to present their claims. "Certainly, the failure to invite participation of the party seeking to exercise first amendment [and common law rights] reduces the possibility of a narrowly drawn order, and substantially imperils the protection which the amendment [and the common law] seeks to assure." *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 184, 89 S.Ct. 347, 353, 21 L.Ed.2d 325 (1968). The importance of the rights involved and interests served by those rights require that the public and press be given an opportunity to respond before being denied their presumptive right of access to judicial records.

723 F.2d at 475.

To protect this right, the Sixth Circuit even suggested that motions to seal the record be docketed with the clerk of the court, which dockets will be public records on file sufficiently in advance of a hearing "to afford interested members of the public an opportunity to intervene and present their views to the court." 723 F.2d at 476. Citing *Criden II*, 675 F.2d at 559, the Sixth Circuit noted again:

> The district court should then allow interested members of the public a reasonable opportunity to present their claims, without causing unnecessary or material delay in the underlying proceeding.

723 F.2d at 476. Quoting from *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 2939, 61 L.Ed.2d 608 (1979) (Blackmun, J., concurring in part and dissenting in part), the Sixth Circuit noted:

> This opportunity need not take the form of an evidentiary hearing; it need not encompass extended legal argument that results in delay....

723 F.2d at 475.

Defendant Consumers Power Co. would have this Court limit the opportunity of the public and the press to present their views on a court order limiting access to informa-

tion to situations where the materials have already been filed in the court. They assert:

> The [*Knoxville*] opinion is limited to judicial documents and court records and has no application to pretrial discovery documents until such documents are filed with the court.

(Consumers Power's Supplemental Memorandum, p. 3). Such a rule would be easy to administer since it provides a bright line for when the press or public would have standing to question the entry of a protective order. It is easy to determine when something is filed in the court. It would also be easy for parties to manipulate the time of filing and thereby deprive the press and public of standing to intervene. Such a position should, however, be rejected. First, it misconstrues the importance of a filing decision under Fed.R.Civ.P. 5(d) as defining "judicial records". As discussed below, the Advisory Committee on the Federal Rules clearly intended situations where non-parties could seek court ordered access to discovery materials not yet filed in court. Second, such a position does not serve the underlying policy considerations of *In re Knoxville News-Sentinel* and a series of other cases in which the press and public's right to access have been raised. Other courts have allowed media intervention to challenge pretrial blanket orders that delegate to parties power to designate documents "confidential" to be placed under seal when filed. *In re Consolidated Pretrial Proceedings,* 10 Med.L.Rept. 2430 (9th Cir. Oct. 5, 1984). See also *Plaquemines Parish Comm. Council v. Delta Development Co., Inc.,* 47 So.2d 560 (La. 1985).

The public's important right of access to information relating to the functioning and public understanding of the judicial process should not be totally dependent on the fortuity of filing dates controlled largely by the party-ligitants. What may be permitted among private parties acting alone is not necessarily the standard when public institutions are involved. When litigation is commenced, private disputants invoke the coercive power of the government through its courts. Once the judicial powers of government are engaged, the public has a legitimate interest in its appropriate exercise. When a court adopts a protective order, what might otherwise be a *private* accommodation among the parties becomes a *public* ordering. The court, through a protective order, lends its legitimating force to an agreement between the parties with respect to the pretrial disclosure of information. A court order is enforceable by its summary sanctioning powers, including the power to impose the sanction of contempt.

When the judicial order restrains the litigants from public disclosures of the pretrial discovery information, then first amendment rights of the parties and the public are involved.

> Without access to the proceedings, the public cannot analyze and critique the reasoning of the court ... One of the ways we minimize judicial error and misconduct is through public scrutiny and discussion.

*Brown & Williamson Tobacco Corporation v. Federal Trade Commission,* 710 F.2d 1165, 1178 (6th Cir.1983). In litigation in which the public's interest is aroused, the Sixth Circuit cautions that "the district court should not be placed 'in the position of sole guardian of first amendment interests even against the express wishes of both parties.'" *Knoxville,* 723 F.2d at 475. When both parties consent to an order, the district court is less likely to have the opportunity for the full and careful consideration that is anticipated when matters are contested in the adversary system. Without standing by outside parties to challenge such behavior, the administrative convenience of adopting stipulations of parties without rigorous review could result in unintelligent and non-reflective use of the court's power. It could lead to limitations being too easily and frequently adopted. The court may forego all inquiry on whether a party's "consent" to a stipulated order is freely given. As Booth Newspapers, Inc. notes, a party of unequal strength, resources and endurance may be forced to

consent to avoid burdensome costs of compelling discovery.

█ When a protective order affects the availability of information to the press and the public, it is appropriate that the press and the public should be able to challenge such use of governmental power by the court. When the court is requested to close the courtroom, expunge or seal judicial records, or seal the files and lips of litigants regarding what has been discovered before trial, a limited right to be heard should be afforded the press where the matter is of sufficient public concern that the press requests a hearing. Such challenges by the media will help assure that court orders are narrowly drawn, that they meet the good cause standard of Rule 26, and that the respective interests of the public as well as the parties are given due weight and consideration.

In other settings, the courts have developed the use of *amicus curiae* who courts appoint:

... to aid and assist the court by the performance of certain services which are necessary to guide the court to a proper conclusion. The need of such assistance arises more often in matters in which the public interests are involved than in ordinary litigation ...
A person may be granted leave to appear as *amicus curiae* when he has no right to intervene and participate as a formal party in the suit.

4 Am.Jur.2nd, § 3 at 110.

█ Accordingly, while *In re Knoxville News-Sentinel* dealt with the sealing and exclusion of matters already filed in the court and thus a matter of court record, its message should not be limited to such situations. Rather, the press should be accorded limited standing to help guide the court in the exercise of its power to assure that when its orders have potential impact on first amendment right they are consistent with the public interest and not overbroad. Such careful review of court orders is warranted whether the court is using its power to limit access to the courtroom or to court documents, or to inhibit public discussion

and disclosures of pretrial information by the parties. Under *Seattle Times*, a court has a greater scope of freedom, subject to less strict standards of review on appeal, when inhibiting access to pretrial discovery materials and pretrial disclosures and statements by parties and their counsel than when closing the courtroom or barring access to judicial materials used in court. Yet, a court's pretrial orders are nonetheless subject to limits when they implicate the first amendment. When proffered, input from the press should be allowed to help assure compliance with the appropriate standards and fairness to the public as well as the parties. The intervention required is not a full-scale intervention under Fed.R.Civ.P. 24(b), nor does it necessarily require an evidentiary or other courtroom hearing. It does require a review of the challenge asserted and a response articulating the reasons for the court's action.

Consumers Power Co. has supplied the Court with a decision of the Michigan Court of Appeals, *In re Dow Chemical Co. v. Consumers Power Co.; Booth Newspapers, Inc., et al. v. Midland Circuit Judge, Dow Chemical Co., Consumers Power Co., Bechtel Power Corp. and Bechtel Associates, P.C.*, 145 Mich.App. 396, 377 N.W.2d 868 (1985), in which the Michigan Court of Appeals denied the newspapers standing to challenge a protective order assuring confidentiality of documents disclosed by Bechtel Power Corp., not a party to the litigation, which documents were not filed with the court. In that case, Booth Newspapers was seeking intervention to gain full access to the documents. The Michigan Court of Appeals cited *Oklahoma Hospital Association v. Oklahoma Publishing Co.*, 748 F.2d 1421 (10th Cir. 1984), *cert. denied*, — U.S. ——, 105 S.Ct. 3528, 87 L.Ed.2d 652 (July 1985) for its denial of standing to intervene. Both cases, however, are distinguishable. As noted by the Michigan Court of Appeals:

Michigan has long held that the public is not entitled to access of courthouse records until after the trial has at least

commenced in open court. (citations omitted) (377 N.W.2d at 871.) The federal courts have not adopted so restrictive a rule.

■ In another portion of its opinion, the Michigan Court of Appeals noted that under the 1985 Michigan Court Rule 2.302(H) discovery materials are required to be filed only if they are to be used at trial or for a motion. The notes to this rule state that it differs from prior Michigan practice and the federal rules. Whatever the limitations the Michigan rule may entail for Michigan state courts, federal rules and practices apply in the present case. Wright and Miller, *Federal Practice and Procedure*, § 2402, (1st Ed.1971), note that in federal court a deposition is a public document freely open to inspection after it is filed with the clerk. The 1980 amendments to Fed.R.Civ.P. 5(d) allow local court rules to preclude the filing in court of depositions, interrogatories, and other pretrial discovery unless needed for use in a proceeding or "on order of the court". Local Rules for the Eastern District of Michigan address the issue of the filing of certain discovery materials. Local Rules 16(a) and (e) anticipate that written responses to discovery requests such as interrogatories and requests for admission will be filed with the court. But Local Rule 16(g) delays filing of depositions until needed for a trial or motion. Neither the Advisory Committee on the 1980 amendments to Federal Rule 5(d) nor this Court in adopting Local Rule 16(g) intended to curtail any third party access to pretrial discovery documents that used to be required to be filed with the court. Indeed, the Notes of the Advisory Committee on the 1980 amendments to Federal Rule 5(d) and our Local Rule 16(g) make clear that the reason for the change was the courts' "serious problems of storage" facilities, not any intent to reduce third party access to pretrial discovery. The Advisory Committee Notes acknowledge the interests of

> those who may have no access to them except by a requirement of filing, such as members of a class, litigants similarly situated, or the public generally. Ac-

cordingly, this amendment and a change in Rule 30(f)(1) continue the requirement of filing but make it subject to an order of the court that discovery materials not be filed unless filing is requested by the court or is effected by parties who wish to use the materials in the proceeding.

Notes to an earlier draft of proposed Federal Rules of Civil Procedure amendments to limit and delay filing of discovery materials state:

> It is intended that the court may order a filing on its motions at the request of a person who is not a party who desires access to public record, subject to the provisions of Rule 26(c).

77 F.R.D. 613, 623 (1978).

Our Local Rule 16(g)(3) requires the party taking a deposition to file a notice of the completion of the deposition to ensure that the docket shows the existence of the deposition, its date, the name of the person deposed, and the name of the custodian of the deposition. This information is for non-parties to the litigation since parties would have such information. The rule anticipates that some non-parties may seek access through a court order. If, as the Michigan Court of Appeals suggests, the Michigan practice is less hospitable to intervention and issues of access, its precedent is of limited value for this Court since the federal practice and Sixth Circuit opinions suggest a greater sensitivity to such claims of non-parties.

In the Michigan Appeals Court *Dow Chemical Co.* case and the Tenth Circuit *Oklahoma Hospital Association* case, the newspapers were seeking access to the pretrial discovery and not simply removal of the pretrial protective order that prohibited access. There is a continuum of court postures with respect to pretrial documents not yet on file with the court: (I) Court prohibition by a protective order of party disclosure of such information; (II) Court neutrality leaving the parties freedom to volunteer or to acquiesce to media requests for discovered data; (III) Court ordered access and disclosure of the data. The

present challenge involves only a review of a protective order under (I) above. In *Oklahoma Hospital Association* there was sought a type (III) order "directing the parties to allow the public [including Oklahoma Publishing Co.] access to all documents produced pursuant to discovery." 748 F.2d at 1423. Intervention was denied since vacating the order would not assure access. In the Michigan Court of Appeals case access, not merely a removal of a barrier to access, was also sought. In the present case, Booth Newspapers seeks not access, but merely a removal of a court imposed barrier to access that makes it impossible for them to bargain with the litigants for information gleened through discovery.

As noted in *Oklahoma Hospital Association* and *Seattle Times*, at common law pretrial depositions and interrogatories were not generally available to the public. Yet, at common law parties were also not prohibited from disclosing information obtained before trial to the press or public. Thus, the situation at common law was category (II), above, where the court neither prohibited nor ordered access to data the parties discovered prior to trial. Unlike *Oklahoma Hospital Association* and the Michigan Court of Appeals case, Booth Newspapers in the present case is seeking to intervene only to challenge a protective order and to restore the common law posture of court neutrality where the parties and press were free to volunteer, importune or negotiate over disclosure of information obtained prior to trial. It is to challenge a non-neutral posture and order of this Court that Booth Newspapers, Inc. seeks to intervene. On this issue they can allege injury that is traced to this Court's protective order and that could be redressed by a vacating of the protective order which would then leave Booth Newspapers, Inc. and the parties free to live by their wits and negotiate freely over sharing of information. See *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 758, 70 L.Ed.2d 700, quoted in *Oklahoma Hospital Associa-*

*tion,* 748 F.2d at 1424. Thus, the recent Michigan Court of Appeals case is distinguishable and not binding on this court on the question of intervention.

## 2. *The Issue of the Legitimacy of the Protective Order:*

### A.

■ The standard to be used to determine whether it is appropriate to issue a protective order affecting pretrial discovery does not require the strict scrutiny and least restrictive alternative tests that apply to restrictions on traditionally public sources of information. The *Seattle Times* case noted that pretrial access of party litigants to information from their opponents is

> a matter of legislative grace. A litigant has no First Amendment right of access to information made available only for purposes of trying his suit.

> \* \* \* \* \* \*

> [P]retrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law.... Much of the information that surfaces during pretrial discovery may be unrelated or only tangentially related to the underlying cause of action. Therefore, restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information.

104 S.Ct. at 2207–2208.

While the Supreme Court rejected the exacting strict scrutiny test in determining the legitimacy of restrictions imposed under rules like Fed.R.Civ.P. 26, the Court noted:

> The critical question that this case presents is whether a litigant's freedom comprehends the right to disseminate information that he has obtained pursuant to a court order that both granted him access to that information and placed restraints on the way in which the information might be used. In addressing that question it is necessary to consider whether the "practice in question [fur-

thers] an important or substantial governmental interest unrelated to the suppression of expression" and whether "the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved."

104 S.Ct. at 2207.

It found that enabling parties to litigation to obtain information relevant to the subject matter involved to help prepare for trial did further "a substantial governmental interest unrelated to the suppression of expression." *Id.* at 2207–2209.

Given the potential for abuse, the Supreme Court noted the necessity of limiting discovery when used to delay, to impose litigation costs and to intrude on privacy interests of litigants or third parties. 104 S.Ct. 2208. When there is *good cause* shown under the discovery rule, the court can issue protective orders. In such situations, governmental interest in preventing abuses is unrelated to the suppression of expression since it is a necessary ancillary power of the court in forcing litigants and third parties to make pretrial disclosures to assist in the preparation for trial.

*Seattle Times* upheld the protective order to secure privacy interests of third parties who were exercising their first amendment rights of association and contribution to a religious organization and expecting freedom from public disclosure, harrassment and reprisals. 104 S.Ct. at 2204. While according broad discretion to the trial court, *Seattle Times* recognized that protective orders are subject to scrutiny under the first amendment. A protective order must promote some important or substantial governmental interest unrelated to suppression of expression and the limitations on first amendment freedoms resulting from the order must be no greater than necessary to protect the government interest involved. *Id.* at 2207.

The three-part test articulated in *Seattle Times* involves the elements considered in evaluating a time, place and manner restriction:

[T]hat the regulation serve an important governmental interest; that this interest be unrelated to the content of the information to be disclosed in the proceeding; and that there be no less restrictive way to meet that goal. See *United States v. O'Brien,* 391 U.S. 367, 377 [88 S.Ct. 1673, 1679, 20 L.Ed.2d 672] (1968).

*Brown & Williamson Tobacco Corp. v. Federal Trade Commission,* 710 F.2d 1165, 1179 (6th Cir.1983). In *Brown & Williamson,* the Court noted the other common law exceptions to judicial disclosure—involving privacy rights of participants or third parties, trade secrets and national security.

Booth Newspapers, Inc., asserts a common law right of access to civil pretrial discovery documents. Defendants deny the existence of any case precedent creating such a common law right. Defendant Morgan-Stanley & Co. even asserts that there is no precedent that a protective order entered upon a party's stipulation requires a formal showing of good cause. The latter position is not supported by *Seattle Times* and is clearly rejected by other courts, *Sharjah Investment v. P.C. Telemart,* 107 F.R.D. 81, 11 Med.L.Rep. 2383, (S.D.N.Y., 1985) (Edelstein, J.); *S.A.R.L. Orliac v. Berthe,* 765 F.2d 30, 11 Med.L. Rep. 2287, (2nd Cir.1985).

### B.

Were there a clear line of judicial reasoning at common law on this issue, such collective wisdom would be instructive to the current controversy. The broad ranging discovery rights that come with the 1938 Federal Rules did not exist at common law. The present dispute involves open discovery for inspection and copying of documents, with restrictions on disclosure to persons other than those involved in this litigation. In the absence of clear lessons from common law, the issue should be considered in light of the needs of modern litigation and the policies underlying the current development of first amendment analysis.

The first amendment as it has evolved in court decisions protects two fundamental core values. The first value is the value of free expression. The second value is the value of self-government of the citizenry. Z. Chaffee, *Free Speech in the United States*, 33 (1954), referred to in *Saxbe v. Washington Post Co.*, 417 U.S. 843, 862, 94 S.Ct. 2811, 2821, 41 L.Ed.2d 514 (1974) [Powell, J., dissenting].

> What is at stake ... is the societal function of the first amendment in preserving free public discussion of governmental affairs.... [The first amendment] embodies our Nation's commitment to popular self-determination and our abiding faith that the surest course for developing sound ... policy lies in a free exchange of views on public issues. And public debate must not only be unfettered; it must also be informed.

*Saxbe v. Washington Post Co*, 417 U.S. at 862–63, 94 S.Ct. at 2821. [Powell, J., dissenting]. (Footnotes omitted.)

■ Thus, the first amendment protects freedom of communication on matters relating to the functioning of government. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). As noted above, one of the reasons for openness in litigation is to monitor official conduct. As noted by Justice Brennan in his concurring opinion in *Richmond Newspapers*, the right of access is implicit in the notion of the first amendment's "*structural* role ... in securing and fostering our republican system of self-government." *Id.* at 587, 100 S.Ct. at 2833.

> ... [T]he first amendment protects the public and the press from abridgement of their rights of access to information about the operation of their government, including the Judicial Branch....

*Richmond Newspapers*, 448 U.S. at 584, 100 S.Ct. at 2831 (Stevens, J., concurring).

Since part of the process of self-government in a democracy is undertaken by and through the courts, the evolving concepts of access under the first amendment relate to the availability of information that is critical to the process of self-government.

If the public has a first amendment right to assay the functioning of its government—including the court—the doctrinal basis for access is to "insure that this constitutionally protected 'discussion of government affairs' is an informed one." *Globe Newspaper v. Superior Court*, 457 U.S. 596 at 605, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (Brennan, J.).

In *Cox Broadcasting Corporation v. Cohn*, 420 U.S. 469, 491–92, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975), the Court said:

> In the first place, in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring him in convenient form the facts of those operations.... With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.

Justice Stevens, in *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), noted that the first amendment's concerns were broader than effective judicial administration. The principle of the first amendment involves furthering discussion on "the functioning of government". (Stevens, J. quoting *Richmond Newspapers*, 448 U.S. at 575, 100 S.Ct. at 2826). "[T]he societal function of the first amendment in preserving free public discussion of government affairs" means that the validity of an access claim should be based on whether it "makes a positive contribution to this process of self-governance." *Press-Enterprise*, 104 S.Ct. at 828 (Stevens, J., concurring). The concept of *public* can be limited to that which is historically open and available to the public, or it can be defined as that which is "of or pertaining to the people".

Thus, to give proper weight to the policy implications involving the first amendment rights of access, it is appropriate for courts to go beyond the historical analysis of what has been permitted in the past at common law and to consider claims of access in light

of what information will "[make] a positive contribution to the process of self-governance."

The litigation that is presently before this Court involves a subject matter of great public interest—including governmental regulations of the nuclear power industry, of utilities, and of the sales of securities. Such governmental interest and involvement is broader than most cases in the courts. In such litigation, the issues of access and the manner in which the court utilizes its power and authority to foster or limit access should factor in the first amendment principles of what information is necessary to the public in a democracy to allow for free and open debate of issues of great public concern. In considering whether the public or its surrogate, the press, should have access to information, the issue should not be determined solely by the historical happenings at common law. Rather, its resolution should also take into account the functional needs of contemporary society.

Access to pretrial documents furthers several important functional goals of society. Court proceedings can be evaluated by individuals who are informed about the issues. Access to pretrial documents lessens the likelihood of private or public graft or judicial ignorance. Pretrial access to information helps the public better understand judicial proceedings and public confidence in the judicial system as a whole can be enhanced. These functional needs of society must be balanced against the functional needs of the judicial system. As a result, the scope of public access may need to be narrowed and its timing deferred.

Our judicial system is dependent on the lengthy and difficult tasks of pretrial fact investigation. Only effective operation of pretrial discovery procedures will foster a full development of facts to inform both the courts and the public. Yet, litigation and the discovery rights that accompany it are not intended as surrogates for freedom of information or sunshine laws. Were they so, they would constantly be resisted by parties out of fear of abuse by opponents or exploitation by competitors. The court's discovery rules are intended not to restrict free expression but to enhance access to information for the purpose of judicial decision making. Safeguards against abuse of discovery or against inefficient resistence to open access and party cooperation are necessary to make the rules of discovery work.

The goal of our system of discovery is to maximize voluntary compliance and minimize the coercive intrusions of the court and the expensive transaction costs which that entails. It is believed that certain time, place and manner restrictions to protect the litigants, as well as targeted protections of established privacy and proprietary interests, will foster the workings of discovery. While such protections may delay or restrict altogether public access to certain information, protective orders can serve the public goals for which the discovery rules compel disclosure of information in the first place—the development of complete, relevant and reliable data on matters in litigation for a more "just, speedy, and inexpensive determination of every action" whether by private agreement or public trial. (Fed.R.Civ.P. 1.) Nor does the court's protective order necessarily preclude the public from obtaining the information. The public can gain information through its other governmental branches.[1]

The evolution of a case in litigation involves increasing degrees of public visibility. In its final chapter with the full trial, the relevant facts have been marshalled for public review and resolution in a court. Here the Supreme Court requires the

---

1. The public is not dependent on the judicial branch and litigation for access to information relating to the Midland nuclear power plant constructed by Consumers Power. Much information is available through the Freedom of Information Act from the Nuclear Regulatory Commission. In addition, the Public Service Commission has sought substantial information on the Midland plant and the Michigan Legislature has additional powers to gain access to such information.

strictest tests for any exclusion of the public. In the case's earlier phases of preparation, the Supreme Court applies a less restrictive test. The present order covers information exchanges at the earliest phase of the litigation. It restricts disclosure of documents or their contents only to those persons involved in the litigation. It permits future use of such documents in more public chapters of the litigation including depositions, motions, briefs, pleadings, arguments and trial.

Because of the safeguards provided by this order, Consumers Power gave the plaintiffs immediate and unrestricted access to all its documents, without further intervention by the Court or costly motions. At the hearing on this motion for review, Consumers' attorneys noted that in the absence of such an order, they would not have voluntarily granted to opponents uninhibited access. The order provides the parties with protections against undue exposure of private or proprietary information while the relevant data is screened from the irrelevant. It provides the parties the opportunity to seek more carefully targeted protective orders, if needed, before relevant information becomes public in the later phases of litigation.[2] The protective order also serves two goals for the efficient administration of our courts. First, it provides an atmosphere to facilitate early cooperation among the parties. Second, it limits the expense and other transaction costs of involving the Court in an enormous number of minor controversies in filtering through a sea of documents.

■ Thus, the present protective order serves an important government purpose of fostering immediate, unrestricted access to discovery documents of potential relevance to the case. It encourages cooperation among the parties instead of unneeded antagonism and contentiousness. Finally, it avoids the premature and inefficient use of judicial involvement in the earliest stages of information exchange. These goals are not related to the suppression of expression. The order is no broader than necessary to promote these governmental interests. It is not a total bar on disclosure. Indeed, it anticipates use of the documents and their contents in later public portions of the case. Any efforts to close or seal the content of these later proceedings will require further motions and an additional and more specific showing of good cause. Thus, at the present time there is no need for a modification of this protective order.

SO ORDERED.

---

**2.** As in *Seattle Times,* good cause must be established for protective orders to keep relevant information from being disclosed.