924 P.2d 273

JOHN DOES I THROUGH III, James Doe, on behalf of John Doe II, and Jane Doe, on behalf of John Doe II, Plaintiffs,

v.

ROMAN CATHOLIC CHURCH OF the ARCHDIOCESE OF SANTA FE, INC., a New Mexico corporation, Defendant–Appellant

and

Jason E. Sigler a/k/a Jay B. Sigler, Bishop Arthur Tafoya and Clarence Galli, Defendants,

and

The Albuquerque Journal, Inc., The New Mexico Tribune Company, and KOB–TV, Inc., Intervenors–Appellees,

and

Robert F. Sanchez, Real Party in Interest–Appellant.

No. 16296.

Court of Appeals of New Mexico.

Aug. 1, 1996.

Certiorari Denied Sept. 17, 1996.

308

Robert H. Clark, Arthur O. Beach, Sean Olivas, Keleher & McLeod, P.A., Albuquerque, Karen C. Kennedy, Karen Kennedy & Associates, Albuquerque, for Appellant Roman Catholic Church of the Archdiocese of Santa Fe, Inc.

William S. Dixon, Charles K. Purcell, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for Appellee The Albuquerque Journal, Inc.

R.E. Thompson, Charles A. Armgardt, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, for Appellee The New Mexico Tribune Company.

Geoffrey D. Rieder, Silva, Rieder & Maestas, P.C., Albuquerque, for Appellee KOB–TV, Inc.

Richard A. Winterbottom, Stout & Winterbottom, Albuquerque, for Appellant Robert F. Sanchez.

## OPINION

HARTZ, Judge.

(1) This appeal arises out of litigation against the Roman Catholic Church of the Archdiocese of Santa Fe, Inc. (the Archdiocese) brought by several persons who alleged that they had been sexually abused by members of the Roman Catholic clergy. Former Archbishop Robert F. Sanchez (the Archbishop), who was not accused of such abuse, was deposed during the litigation. Two newspapers and a television station (the Appellees) seek disclosure of portions of the deposition. Before the deposition the Bernalillo County District Court entered a protective order (the Protective Order) forbidding release of the videotape or transcript of the deposition without prior court approval. After the case was settled, the district court modified the Protective Order at the request of the Appellees. The modified order (the Disclosure Order) directed the court reporter for the deposition to release extensive portions of the transcript and videotape of the deposition (the Disclosed Testimony) to any members of the media who made satisfactory payment arrangements with the reporter. The Archdiocese and the Archbishop (the Appellants) appeal from the Disclosure Order.

(2) Because one of the plaintiffs' attorneys has expressed the intention to release publicly the Disclosed Testimony if not prohibited from doing so by a court order, we need not decide whether the district court could order the court reporter to release the Disclosed Testimony to the media. Indeed, as explained below, essentially the only issue we need resolve is whether the district court could grant the Appellees standing to challenge the Protective Order. We hold that the district court had that authority. We affirm the Disclosure Order to the extent that it sets aside the Protective Order's prohibition on release of the Disclosed Testimony.

## I. BACKGROUND

(3) Allegations of sexual abuse by priests have received a great deal of attention in both the media and courtrooms of New Mexico. According to counsel for the Archdiocese at oral argument, approximately 150 sexual-abuse lawsuits have been filed against the Archdiocese, of which 50 or so are still pending. Judicial restrictions on publicity regarding the litigation were first imposed on March 26, 1993. On that date District Judge Susan Conway entered orders in several lawsuits, including the one before us on appeal, which severely limited disclosure of materials obtained pursuant to discovery unless such disclosure was authorized by a later court order. The order recited several reasons for

the limitations, including the defendants' interest in a fair trial, the need to conduct settlement negotiations free of the coercion that could arise from threats to disclose information, and the privacy interests of litigants and third parties.

(4) After he was noticed for a videotaped deposition to be conducted on January 12, 1994, the Archbishop moved for further protection. His motion requested that the deposition be taken at a confidential location within a half-day's airplane travel from Albuquerque, that inquiry be prohibited with respect to certain subject matter, and that the court forbid disclosure of the contents or substance of his testimony and of the time and place of the deposition. District Judge Philip Ashby heard the motion on January 5, 1994. He then prepared an order, and on January 12 he conducted a hearing to consider objections to the proposed order.

(5) At the hearing William Dixon, the attorney for The Albuquerque Journal, one of the Appellees, argued that there were insufficient grounds for a protective order limiting disclosure of the Archbishop's deposition. Judge Ashby responded:

> I can understand your concerns. I'm going to enter the order as proposed. There are matters which may or may not come up in this deposition, which I feel might very seriously affect a fair trial. I'm not primarily concerned with the privacy of Archbishop Sanchez, because he is a public figure, but I do feel strongly that the fair trial rights of all the parties may be affected in this case. I really think your motion is premature. If after the deposition is taken and the Court is then—can be made aware of what was in the deposition, if you or any other counsel on behalf of any media wants to move at that time to open the deposition, I will hear the arguments at that time, Mr. Dixon, but at this time I'm denying your motion which I consider to be a motion filed formally on behalf of the Albuquerque Journal.

(6) The order imposed some restrictions on the scope of the deposition, prohibited disclosure of the location of the deposition, and stated:

> The transcript of the deposition will be sealed, and the original of the videotapes will be maintained privately by counsel for the party taking the deposition, and will not be released to any other third person or organization without prior order of the Court. All provisions of the previous order regarding dis[s]emination of information obtained in discovery will remain in effect and pertain to this deposition.

(7) On April 4, 1994, after completion of the deposition, The New Mexico Tribune Company, another of the Appellees, moved to vacate or modify the protective orders of March 26, 1993 and January 12, 1994. It requested alternatively (1) permitting the litigants or their counsel to disseminate immediately the transcript and videotape of the Archbishop's deposition, (2) permitting such dissemination immediately upon the use of any part of the deposition in court, or (3) permitting such dissemination as soon as the case was resolved at trial or by settlement. The motion recited that counsel for the defendants did not consent to the motion and that counsel for the plaintiffs neither consented to nor opposed the motion.

(8) Three days later The Albuquerque Journal moved to intervene and moved for an order (1) vacating the prior protective orders, (2) requiring that the transcript of the Archbishop's deposition be filed with the court clerk and be available to the public, and (3) permitting release of the deposition by the parties. As with the Tribune's motion, the motion recited that counsel for the defendants did not consent to the motion and that counsel for the plaintiffs neither consented to nor opposed the motion.

(9) District Judge Conway conducted a hearing on the motion on May 10, 1994. After reviewing the depositions she issued a letter opinion on October 5, 1994. The opinion listed extensive portions of the deposition that should be disclosed. It also requested additional information, apparently to determine whether further disclosures would violate privacy interests of litigants and third parties. KOB–TV, Inc., the third Appellee, then moved to intervene, seeking the same access to the deposition testimony as the other movants. The district court issued an

additional letter opinion on January 17, 1995 and an addendum to that letter on the following day. The district court proceedings concluded with a presentment hearing on March 8 and entry of an order on March 14, 1995. As previously stated, the order directed the official court reporter to provide the Disclosed Testimony to the movants. Other members of the media could make arrangements with the court reporter to obtain the same materials. The court stayed its order until March 28, 1995 to permit the Archdiocese and the Archbishop to appeal.

(10) The Archdiocese and Archbishop filed their notice of appeal from the Disclosure Order on March 23, 1995. They simultaneously filed a motion to stay the Disclosure Order until determination of the merits of their appeal. This Court denied the motion for such a stay but extended the stay until April 19 to permit the Appellants to seek review by the Supreme Court. The Supreme Court extended the stay, and on July 12, 1995 it ordered that the Disclosure Order be stayed pending completion of the appeal. While the matter was pending before it, the Supreme Court directed the parties to file briefs on several issues, including whether the Appellees had standing to challenge the Protective Order when none of the parties had objected to the order. In support of their brief addressing the standing issue, the Appellees submitted an affidavit of Merit Bennett, who had represented several of the plaintiffs in the suits against the Archdiocese. The affidavit stated that were it not for the Protective Order, he would provide the Archbishop's deposition to anyone who asked for it.

## II. DISCUSSION

### A. Issues Not Decided

(11) The Appellants contend that (1) the district court had no authority to issue the Disclosure Order and (2) the Appellees had no standing to challenge the Protective Order. We begin our discussion by explaining why we need address only the second contention.

(12) There are two potential questions concerning the authority of the district court to issue the Disclosure Order: whether the court could *permit* disclosure of the Disclosed Testimony and whether the court could *order* its disclosure. The question that is the focus of the briefs on appeal is whether the district court had authority to order the court reporter to disclose to the Appellees various portions of the Archbishop's deposition. It is one thing for a court to say that a party or attorney is not forbidden from disclosing discovery material. It is quite another for a court to order a party, attorney, or third person to disclose the material to any particular non-party. In the present case, however, the difference is only theoretical. Merit Bennett's affidavit makes clear that it is not necessary for the district court to order anyone to disclose portions of the Archbishop's deposition to the Appellees. If the Protective Order is lifted with respect to portions of the deposition, Mr. Bennett will release those portions to whoever requests them. Although the Appellants suggest that only the client, not the attorney, can decide to release the Disclosed Testimony, we note that ordinarily the attorney has such authority, *see* Charles W. Wolfram, *Modern Legal Ethics* § 12.3.2, at 640 (1986), and, in any event, we presume that Mr. Bennett is acting consistently with instructions from his clients. *Cf. Sun Country Sav. Bank v. McDowell*, 108 N.M. 528, 532, 775 P.2d 730, 734 (1989) (absent evidence to contrary, court presumes that attorney has authority of client to act at hearings). Of course, we cannot be absolutely certain that Mr. Bennett will disclose the material if the Protective Order is lifted. Even assuming, as we must and do, that the affidavit was executed in good faith, various contingencies could arise. Nevertheless, courts traditionally do not reach out to decide issues unnecessarily. *See generally* 5 C.J.S. *Appeal and Error* § 705 (1993). Because the Appellees will obtain the same relief whether (1) the Disclosure Order is enforced in full or (2) it is enforced only to the extent that it lifts the Protective Order with respect to the Disclosed Testimony, we need not resolve whether the district court has power to order disclosure. We decide, for the reasons discussed hereafter, only that the Disclosure Order should be affirmed to the extent that it

lifts the Protective Order with respect to the Disclosed Testimony. If, for some reason, lifting the Protective Order does not provide the Appellees as much relief as would be provided by the Disclosure Order in its entirety, the matter can be brought to the attention of this Court for further consideration.

■ (13) As for the authority of the district court to *permit* disclosure of the Disclosed Testimony, the question is simply whether relaxing the Protective Order was substantively correct. That is, assuming that the Appellees had standing to challenge the Protective Order, or that one of the plaintiffs had challenged it, was there any legal error in the district court's removing the restrictions of the Protective Order with respect to the Disclosed Testimony? We need not answer that question because it has not been properly raised by the Appellants on this appeal. NMRA 1996, 1–026(C) (Rule 26(C)) permits the district court "for good cause shown" to issue a protective order "which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense." The Appellants acknowledge, as they must, that the district court has broad discretion in determining whether good cause exists, and that we will reverse a protective order or a modification of a protective order only for abuse of that discretion. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 36, 104 S.Ct. 2199, 2209, 81 L.Ed.2d 17 (1984); *Ex parte General Motors Acceptance Corp.,* 631 So.2d 990, 991 (Ala.1994); *Loveall v. American Honda Motor Co.,* 694 S.W.2d 937, 939 (Tenn.1985); *Earl v. Gulf & W. Mfg. Co.,* 123 Wis.2d 200, 366 N.W.2d 160, 164 *review denied,* 123 Wis.2d 549, 371 N.W.2d 376 (1985); *cf. State ex rel. California v. Ramirez,* 99 N.M. 92, 94, 654 P.2d 545, 547 (1982) (discretion to enter protective order requiring party to pay cost of opposing counsel's travel to deposition). Yet, the Appellants have not established an abuse of that discretion. They have not pointed to any particular portion of the Disclosed Testimony and argued that the district court was required to find good cause to continue the Protective Order prohibiting disclosure of that specific testimony.

■ (14) To the extent that the Appellants may be contending that pretrial discovery is inherently private and that the district court should never permit anyone (not even an opposing party) to release any part of it, we can dispose of that contention in short order. We are aware of no authority for the proposition. On the contrary, the very language of Rule 26(C) implies that those who obtain information through discovery should not be restrained from disclosing that information absent a showing of good cause why disclosure of particular information would be inappropriate. As previously stated, the Appellants have not attempted such a showing on appeal.

(15) Thus, there remains only one issue that must be decided to resolve this appeal: Did the Appellees have standing to challenge the Protective Order? We now turn to a discussion of that issue.

**B. Standing**

(16) At first blush it may appear that the New Mexico Supreme Court has provided an easy answer to the standing issue. In *De Vargas Savings & Loan Association v. Campbell,* 87 N.M. 469, 535 P.2d 1320 (1975), the Court wrote: "We hold that to attain standing in a suit arguing the unlawfulness of governmental action, the complainant must allege that he is *injured in fact* or is imminently threatened with injury, economically or otherwise." *Id.* at 473, 535 P.2d at 1324 (emphasis added). One could conclude that because the Appellees have suffered an actual injury—the inability to acquire information that Mr. Bennett is willing to disclose to them—the Appellees would have standing.

(17) Such a conclusion would be premature. Our Supreme Court in *De Vargas* relied heavily on federal law. The phrase "injury in fact" appears in *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), a decision discussed at length in *De Vargas.* In federal law, "injury in fact" is a term of art. *See* 13 Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 3531.4, at 419 (1984). As explained in a leading treatise: "It is not enough to estab-

lish standing that an identifiable interest has been injured. The injured interest must be one that the courts will recognize for standing purposes.... Thus the test of injury in fact leaves it necessary to identify what interests deserve protection against injury." *Id.* at 420. Recently the United States Supreme Court has defined "injury in fact" as "an invasion of a *legally protected interest* which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotations and citations deleted) (emphasis added). This language suggests that the injury necessary to confer standing must be injury to an interest that is entitled to some legal protection, even though the ultimate ruling on the merits may be inimical to that interest. For example, the United States Constitution may protect the interest of the press in attending court proceedings; but in a particular case, compelling reasons may justify closing the proceeding to the press. The press would have standing to contest closure of the proceeding because closure would invade a legally protected interest of the press; but the press would not necessarily prevail on the merits.

(18) Of course, the phrase "injury in fact" may mean different things to the New Mexico Supreme Court and the United States Supreme Court. We should be cautious about adopting the United States Supreme Court's current gloss on the term, particularly when the gloss may constitute a departure from what was commonly understood when our Supreme Court followed United States Supreme Court precedent in *De Vargas.* Nevertheless, it appears that the New Mexico Supreme Court's understanding of "injury in fact" is quite similar to that of the United States Supreme Court. In *De Vargas* itself the Court wrote:

In this case, appellants clearly have standing to seek review of the supervisor's order as associations "aggrieved and directly affected" by the order. Appellants assert they will suffer from undue competitive injury if another branch is permitted in Santa Fe because there is not sufficient business and demand to assure and main-

tain the solvency of existing associations. They also assert another branch will not be to the advantage of the community. These claims are sufficient. In fact, the protection of these interests is explicitly recognized in [the governing statute].

87 N.M. at 473, 535 P.2d at 1324. Thus, the Court found that the injury forming the predicate for standing was an injury to a "legally protected interest."

(19) Other recent New Mexico Supreme Court decisions are consistent with this approach. In *State v. Reynolds,* 119 N.M. 383, 384 n. 1, 890 P.2d 1315, 1316 n. 1 (1995), the Supreme Court noted that a criminal defendant, even though convicted on the basis of certain evidence admitted at trial (undoubtedly a severe injury), may not have standing to challenge admission of the evidence if the alleged unlawful police conduct did not infringe upon the defendant's constitutional rights.

(20) Likewise, in *Key v. Chrysler Motors Corp.,* 121 N.M. 764, 918 P.2d 350 (1996), the Court denied standing to a motor vehicle dealer who sued Chrysler Motors for allegedly acting unreasonably in withholding consent to transfer a dealership franchise to the dealer. The Supreme Court ruled that the dealer had no standing despite financial injury because the statute upon which the dealer relied for relief was not intended to protect the interests of prospective franchisees. *Id.* ¶¶ 10–35. Clearly, injury alone, even a grave one, does not suffice to confer standing.

(21) We also note that New Mexico Supreme Court decisions involving the news media do not undercut this precedent. In *State ex rel. Bingaman v. Brennan,* 98 N.M. 109, 645 P.2d 982 (1982), the Supreme Court denied a television station access to wiretap recordings not introduced into evidence or used in open court. Standing was not discussed in the opinion. Although the fact that the station was a party in the proceeding may represent an implicit determination that it had standing, we should not rely on a decision as authority with regard to matters not addressed in the opinion. *See Sangre de Cristo Dev. Corp. v. City of Santa Fe,* 84 N.M. 343, 347–48, 503 P.2d 323, 327–28

(1972), *cert. denied,* 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 400 (1973).

(22) In *State ex rel. New Mexico Press Ass'n v. Kaufman,* 98 N.M. 261, 648 P.2d 300 (1982), the issue was the validity of restrictions on coverage of a criminal trial. The Supreme Court did not need to decide whether standing was possible in the absence of invasion of a legally protected interest, because the media had such an interest—the First Amendment right of the public (and hence the media) to attend criminal trials, *see Richmond Newspapers v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). (Actually, it was two media associations, not any newspaper or broadcaster, who were granted standing in *Kaufman.* But no issue was raised regarding the right of the associations to pursue the interests of their members.)

(23) In light of this precedent, we are reluctant to hold that the Appellees can suffer an "injury in fact" without suffering injury to a legally protected interest. In any event, we need not resolve that matter on this appeal. Nor need we address the Appellees' contention that the Protective Order infringed their rights under the First Amendment, the common law, and the New Mexico Inspection of Public Records Act, NMSA 1978, §§ 14–2–1 to –12 (Repl.Pamp.1995).

■ (24) We avoid these issues by holding that the Appellees have standing under a different theory. We hold that the district court properly granted standing to the Appellees to challenge the Protective Order insofar as it impinged upon the legally protected interests of third persons, particularly Mr. Bennett. To reach this conclusion, we need to examine the foundations of the law of standing.

■ (25) The requirements for standing derive from constitutional provisions, enacted statutes and rules, and prudential considerations. *See generally United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* — U.S. —, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). In federal court the constitutional requirements are rooted in Article III of the United States Constitution, which limits the federal judicial power to "Cases" or "Controversies." *Id.* at —, 116 S.Ct. at 1533. The United States Supreme Court has held that to satisfy constitutional requirements there must be "(1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *Id.*

(26) The New Mexico Constitution does not speak of Cases or Controversies. Article VI, Section 1 simply states:

The judicial power of the state shall be vested in the senate when sitting as a court of impeachment, a supreme court, a court of appeals, district courts; probate courts, magistrate courts and such other courts inferior to the district courts as may be established by law from time to time in any district, county or municipality of the state.

Article VI, Section 13 adds that "[t]he district court shall have original jurisdiction in all matters and causes not excepted in this constitution[.]" Thus, any constitutional restrictions on standing in New Mexico district courts must derive from the meaning of ."judicial power" in Article VI, Section 1 or the meaning of "matters and causes" in Article VI, Section 13.

(27) Unfortunately, we have found no clear statement in New Mexico case law regarding any constitutional limitations on standing. A suggestion of such a restriction appears in *Asplund v. Hannett,* 31 N.M. 641, 249 P. 1074 (1926), which held that a citizen-taxpayer had no standing to seek an injunction against the governor and other state officers to prevent the alleged misuse of state trust funds. The Court wrote:

In our scheme of government, the function of the courts is to declare and apply the law in the decision of justiciable controversies. We are not placed over the other departments of government, generally, to review or interfere with their acts, as the special guardian of the Constitution. Ours is the judicial power.

*Id.* at 647, 249 P. at 1076. Yet, in *State ex rel. Gomez v. Campbell,* 75 N.M. 86, 400 P.2d 956 (1965), the Supreme Court relied on *Asplund* to deny standing to citizen-taxpayers

but then proceeded to decide the issue because of "our duty to the public." *Id.* at 92, 400 P.2d at 960. One can conclude that the absence of standing did not deprive the court of jurisdiction to decide the matter, which would certainly have been the case if denial of standing had been based on constitutional limitations on the court's power.

(28) Although the case law does not provide guidance regarding requirements for standing imposed by the New Mexico Constitution, we are aware of no basis for concluding that those requirements are stricter than those imposed by the federal Constitution. The concept of "judicial power" in Article VI, Section 1, certainly encompasses those types of power exercised by the federal courts. As for the language "all matters and causes" in Article VI, Section 13 of the New Mexico Constitution, the brief-in-chief of the Archdiocese appears to assume that the New Mexico constitutional provisions have the same effect as the "case or controversy" language in the United States Constitution. Consequently, we do not investigate whether for some reason the New Mexico Constitution imposes stricter requirements. We conclude that there is no constitutional prohibition against the Appellees' standing to challenge the Protective Order if there are present "(1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *United Food,* —— U.S. at ——, 116 S.Ct. at 1533.

■■■ (29) These three requirements are met in this case.[1] First, there is "an injury in fact." The "injury in fact" need not be an injury to the party bringing the action. In *United Food* the United States Supreme Court held that a union may sue to recover backpay for members who did not receive statutorily required notice of a plant closing. The Court wrote: "[T]he general prohibition on a litigant's raising another person's legal rights is a judicially self-imposed limit on the exercise of federal jurisdiction, not a constitutional mandate." —— U.S. at ——, 116 S.Ct. at 1536 (quotation marks and brackets

omitted). Here, even if there was no injury to a legally protected interest of the Appellees, there is certainly such an injury to the litigants and their counsel (in particular, Merit Bennett). Their interest in being permitted to disseminate information they possess is protected by both Rule 26(C) and the First Amendment. *See Seattle Times,* 467 U.S. at 32–34, 104 S.Ct. at 2207–08.

(30) As for the remaining two constitutional requirements, the challenged conduct—the issuance of the Protective Order—is the cause of those injuries, and a "favorable decision"—that is, modification of the Protective Order—would redress the injury. *Cf. Oklahoma Hosp. Ass'n v. Oklahoma Publishing Co.,* 748 F.2d 1421, 1424–25 (10th Cir.1984) (second two requirements not met because newspaper made no showing that lifting of protective order would result in disclosure to newspaper), *cert. denied,* 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 652 (1985).

(31) Next, we address whether any statute or promulgated rule raises an impediment to the Appellees' standing. On occasion New Mexico courts have considered statutory requirements regarding standing. *See, e.g., Key; De Vargas Sav. & Loan.* In this case, however, there is no governing statute. Nor does any court rule address the matter. Rule 26(C) states that courts may enter protective orders "[u]pon motion by a party or by the person from whom discovery is sought"; but no mention is made of who may oppose such a motion, and our rules of civil procedure contain nothing about motions to set aside or modify protective orders.

(32) Thus, whether to afford standing to the Appellees in this case turns on prudential considerations. Those considerations favor standing.

(33) Rule 26(C) permits protective orders only "for good cause shown." This standard reflects the view that ordinarily no restraint should be placed upon a person's right to disclose discovery information however he or she pleases. Indeed, we have already noted that this right finds some protection in the

---

**1.** Because the three requirements are met, we need not decide whether all are required by the New Mexico Constitution.

First Amendment. *See Seattle Times,* 467 U.S. at 32–34, 104 S.Ct. at 2207–08. The obvious candidate to seek vindication of this right by challenging a protective order is the person who possesses discovery information and wishes to disclose it. Yet the realities of litigation are such that the person possessing the information, even though willing to disclose it, may have no incentive to litigate the matter. Litigation is expensive. The chief concern of the party and the attorney representing the party is success in the lawsuit. If the protective order does not handicap pursuit of that objective, challenging the protective order becomes a low priority, particularly if there is concern that such a challenge could jeopardize the ultimate objective by creating ill will from the opposing party or even the court. Thus, it must be recognized that as a practical matter the right to disseminate may receive protection only if a third party is permitted to litigate on behalf of the person possessing the right.

(34) Of course, the fact that a person does not choose to litigate a personal right does not mean that any officious third party should be granted standing to litigate that right. But granting standing to members of the news media such as the Appellees is appropriate for four reasons.

(35) First, one of the more compelling prudential reasons to limit standing does not apply here. Commentators have recognized that standing requirements serve the purpose of preventing the courts from intruding too much into the work of the other branches of government. *See* William A. Fletcher, *The Structure of Standing,* 98 Yale L.J. 221, 222 (1988). It may also serve to prevent undue judicial interference in private arrangements. *See Key.* In the present case, however, the matter to be decided is whether the judiciary has conducted its own "internal" work appropriately: Has the court complied with its own rules in issuing a protective order? Thus, we can tolerate, even welcome, participation by third parties without worrying about meddling in the affairs of the other branches of government or private ordering.

(36) Second, we should presume that the willingness of recognized news media to challenge the protective order indicates a public interest in the material covered by the protective order. Of course, we are not blind to the financial motives that can influence the media, nor are we unfamiliar with the tragic consequences that can flow from irresponsible behavior by the media. But the role of the news media is fundamental to the proper functioning of American society. The media serve as a non-governmental surrogate for the people in pursuing the public interest in information. This role is important in determining whether standing is appropriate. Although a private interest in information withheld pursuant to a protective order may not justify third-party standing, a legitimate public interest in the materials constitutes a policy reason for granting such standing. We note that our Supreme Court has only very recently reaffirmed that the right to bring a cause of action may depend on whether the cause of action vindicates the public interest or merely a private interest. *Garrity v. Overland Sheepskin Co.,* 121 N.M. 710, 917 P.2d 1382 (1996), held that the existence of a cause of action for retaliatory discharge when an employee is fired for making disclosures depends upon whether the disclosures were to advance the employee's private interest or a public purpose. *Id.* at 715, 917 P.2d at 1387. More directly in point, *State ex rel. Clark v. Johnson,* 120 N.M. 562, 568–69, 904 P.2d 11, 17–18 (1995), conferred standing to those petitioning for mandamus simply "on the basis of the importance of the public issues involved." *Id.* at 569, 904 P.2d at 18 (quoting *State ex rel. Sego v. Kirkpatrick,* 86 N.M. 359, 363, 524 P.2d 975, 979 (1974)). Similarly, when considering the suitability of standing by a third party to challenge a protective order, an important factor is whether the third party seeks to vindicate a personal interest or the public welfare.

(37) Third, we have little doubt that news media such as the Appellees in this case will pursue their challenges to protective orders with the "adversarial vigor," *United Food,* — U.S. at —, 116 S.Ct. at 1536, necessary to sharpen the presentation of issues. *See Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Fourth, experience indicates that media challenges to

protective orders will not burden the courts with frivolous litigation.

(38) Thus, we hold that the district court did not err in granting the Appellees standing to challenge the Protective Order in this case. As previously noted, in reaching this result we need not decide whether the news media have a First Amendment interest, or any other legally protected interest, in discovery materials that are not offered in court proceedings. Also, we need not decide whether or when other third parties should be granted standing to challenge a protective order. We decide only the narrow, although important, issue raised by this appeal—the propriety of granting standing to the Appellees to challenge the Protective Order.

(39) In arriving at this result, we are supported by the weight of authority. *Kaufman* granted standing to the New Mexico Press Association and the New Mexico Broadcasters Association to challenge court-ordered restrictions on coverage of a criminal trial. Although the holding in that case could rest on narrower grounds, our Supreme Court observed that "[c]ases from many jurisdictions make it clear that the news media has [sic] standing to question the validity of an order impairing its ability to report the news, even though it [sic] is not a party to the litigation below," 98 N.M. at 264, 648 P.2d at 303; *see Davis v. East Baton Rouge Parish Sch. Bd.,* 78 F.3d 920, 926 (5th Cir.1996) (collecting cases). In particular, other courts have granted news media standing to challenge protective orders governing discovery. *See Grove Fresh Distribs. v. Everfresh Juice Co.,* 24 F.3d 893, 898 (7th Cir.1994); *In re Alexander Grant & Co. Litig.,* 820 F.2d 352, 354 (11th Cir.1987) (per curiam); *In re Consumers Power Co. Sec. Litig.,* 109 F.R.D. 45 (E.D.Mich.1985); *cf. Oklahoma Hosp. Ass'n* (denying standing when no indication that parties would disclose records if protective order were lifted); *Booth Newspapers v. Midland Circuit Judge,* 377 N.W.2d 868, 870 (Mich.Ct.App.1985) (same), *appeal denied* (Apr. 28, 1986) *and cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987). *But see West Va. v. Moore,* 902 F.Supp. 715, 718 (S.D.W.Va.1995) (press has no standing because it suffered no injury in fact); *Mokhi-*

*ber v. Davis,* 537 A.2d 1100, 1102 (D.C.1988) (per curiam).

(40) We affirm the order of the district court insofar as it sets aside the Protective Order with respect to the Disclosed Testimony.

(41) **IT IS SO ORDERED.**

APODACA, C.J., concurs.

BOSSON, J., concurs specially.

BOSSON, Judge (specially concurring).

(42) I agree that an injury in fact must be an injury to an interest that is arguably entitled to some legal protection. I interpret *De Vargas Savings & Loan Ass'n v. Campbell,* 87 N.M. 469, 535 P.2d 1320 (1975) to mean no less, and I believe that *De Vargas,* taken in context, offers ample support for affirmance in this case. Our Supreme Court's recent opinion in *Key v. Chrysler Motors Corp.,* 121 N.M. 764, 918 P.2d 350 (1996) is fully consistent with this conclusion. There, the Court narrowly interpreted a state statute (as opposed to the First Amendment) to confer standing upon only a certain class of litigants. We do not have that situation here. I am persuaded that *Key* intended no deviation from the broad standing principles articulated in *De Vargas* and I do not understand the majority opinion to imply anything to the contrary.

(43) Although I would agree with the analysis of the majority opinion conferring standing upon the media to assert the rights of third persons in this case, I see no need to reach that issue. I would recognize media standing to claim a First Amendment interest in the subject matter of this litigation on its own behalf and on behalf of the public. I would stop there, seeing no need to proceed further. The standing of the New Mexico media to raise First Amendment issues based on access to court-sponsored information could not, in my mind, be clearer and has been blessed more than once by our Supreme Court. *See, e.g., State ex rel. New Mexico Press Ass'n v. Kaufman,* 98 N.M. 261, 264–65, 648 P.2d 300, 303–04 (1982); *State ex rel. Bingaman v. Brennan,* 98 N.M. 109, 111, 645 P.2d 982, 984 (1982). This is not to say the media will always win—only

that they have the right to come into court and make their case, much as they did here. This is also not to say that persons other than the media may or may not demonstrate that they fall within that class of litigants who are properly entitled to seek judicial protection for an alleged breach of First Amendment rights.

(44) Given the historical breadth of the First Amendment, we need not reach so far to resolve the present dispute. I do not believe this case compels us to introduce the notion of "prudential considerations" into New Mexico jurisprudence. These are federally inspired concepts, interpreting "case or controversy" within Article III of the United States Constitution and creating judge-made law for the "prudential" management of the federal courts. Why do we need them to resolve this dispute? These latest federal pronouncements—which themselves are subject to change from forces outside our courts—bring with them a considerable body of criticism from the intellectual community; moreover, they arguably may not even be relevant to the limited issue before us of standing to claim injury under the First Amendment, as opposed to the more complex issue of standing under federal statutes. *See generally* William A. Fletcher, *The Structure of Standing,* 98 Yale L.J. 221 (1988).

(45) New Mexico is a government of reserved, plenary powers as opposed to the limited, enumerated powers of the federal government. Unlike federal courts, our judiciary is one of general jurisdiction. Problems unique to the federal structure ought not be imported into our judge-made law, unless there is a proven need. Seeing none, I would affirm without the analysis of "prudential considerations" and based primarily on *De Vargas.*